42

[861 NYS2d 298]

Tyrone Guzman, by His Parent and Natural Guardian, Shalette Jones, et al., Appellants, v 4030 Bronx Blvd. Associates L.L.C., Respondent.

First Department, June 19, 2008

**APPEARANCES OF COUNSEL**

*Segal & Lax, LLP*, New York City (*Patrick Daniel Gatti* of counsel), for appellants.

*Fiedelman & McGaw*, Jericho (*James K. O'Sullivan* of counsel), and *Law Offices of Alan I. Lamer*, Elmsford, for respondent.

**OPINION OF THE COURT**

Tom, J.P.

This appeal concerns the trial court's role as "gatekeeper" in determining the qualifications of an expert, a neuropsychologist, to render a medical opinion and the adequacy of the foundation upon which that opinion is based. While plaintiffs' expert is

qualified to render an opinion on the extent of plaintiff Tyrone Guzman's neurological deficits and may testify that those deficits are consistent with a history of head trauma, plaintiffs have failed to identify any evidentiary basis for the opinion sought to be elicited from the expert as to which of several accidents is the proximate cause of such deficits. Thus, his testimony as to this isolated point was properly precluded. However, we conclude that the trial court erred in dismissing this action without affording plaintiffs the opportunity to retain another expert witness to establish the nature of Tyrone Guzman's physical injury and its cause, and we remand this matter for further proceedings.

Tyrone Guzman, the infant plaintiff (plaintiff), has a history of head trauma. In the year 2000, he was struck in and above the left eye by a baseball when he was tagged while sliding headlong into first base. He apparently was not treated for this injury. On June 16, 2001, a portion of a bathroom ceiling fell, striking plaintiff in the head and neck. An ambulance report states that he was found, semiconscious, on the floor by his mother and complained that his "neck & back hurt." He was taken to Our Lady of Mercy Medical Center's emergency room, where bruising was noted around the neck and back. A head CT scan was negative. On May 15, 2002, plaintiff was struck in the head by a basketball. He was seen at the emergency room of North General Hospital, where he was diagnosed with contusions of the face, scalp and neck. On September 8, 2004, plaintiff was a back-seat passenger, secured by a lap belt, in an automobile that rolled over at least three times, according to witnesses. He was transported by ambulance to Lehigh Valley Hospital, where a CT scan of the head and X rays of the chest, lumbar spine and left knee were negative. The ambulance report and hospital record differ on whether plaintiff experienced a brief period of unresponsiveness. On October 13, 2004, plaintiff was again seen at Lehigh Valley Hospital in connection with an unspecified motor vehicle accident. He complained of headache and dizziness over the preceding three days, shaking of the legs upon awakening that morning and decreased appetite. His condition was diagnosed as acute viral illness and postconcussion syndrome.

This action seeks damages arising out of injuries allegedly sustained by plaintiff in the apartment owned and maintained by defendant when the bathroom ceiling partially collapsed. Insofar as relevant to this appeal, the complaint, as supple-

mented by plaintiffs' verified bill of particulars, claims that plaintiff experiences post-traumatic headaches as a result of a head injury with loss of consciousness. Plaintiffs' supplemental verified bill of particulars additionally claims that he suffers from various impairments "consistent with a history of head trauma."

Following the exchange of expert witness information, defendant was informed that plaintiffs would offer testimony from Elkhonon Goldberg, Ph.D., an expert in neuropsychology, "as to the effects of the accident of June 16, 2001 upon Tyrese [sic] Guzman's intellectual and cognitive ability, particularly as to the diminution of Mr. Guzman's cognitive and intellectual abilities." The notice indicates that the witness will compare pre-accident and post-accident abilities and educational achievement and "will testify that Mr. Guzman's post-accident cognitive functioning is significantly diminished from its pre-accident state." The notice does not identify the basis for comparison of pre-accident and post-accident abilities. Plaintiffs did not identify any other expert witness who would be produced.

Following jury selection, defendant interposed the instant motion in limine to preclude the proposed testimony of plaintiffs' neuropsychologist. Dr. Goldberg concluded, in two reports he submitted, that plaintiff sustained a traumatic brain injury (TBI) as a result of the ceiling collapse. Defendant argued, inter alia, that: (1) Dr. Goldberg's opinion that plaintiff's injuries were the result of the June 16, 2001 incident was insufficient to establish causation because it was not based on any objective medical evidence in the record; (2) Dr. Goldberg's examinations of plaintiff were flawed because he did not review plaintiff's counseling records and/or school records prior to the issuance of his reports, which indicated that the problems Dr. Goldberg claimed plaintiff suffered as a result of the accident already existed; (3) Dr. Goldberg's two reports failed to take into consideration that plaintiff had a prior accident where he was hit in the left eye with a baseball, and a subsequent accident where he was hit in the head with a basketball, and failed to mention that the CT scan that was conducted on plaintiff on the day of the injury came back negative; and (4) Dr. Goldberg failed to consider that plaintiff was in a car accident, a CT scan came back negative, and only five weeks later he returned to the hospital because he had the shakes, headaches and dizziness, and a new CT scan again came back negative. Thus, de-

fendant concluded, the witness should be precluded from giving testimony relating "his psychological test findings to a medical diagnosis of brain injury."

In opposition, plaintiffs argued that while Dr. Goldberg is not a medical doctor, "[t]here is no magic to the MD degree aside from automatically qualifying by study alone." They noted that a psychologist has been found qualified to testify concerning the limitations resulting from TBI (citing *Hernandez v City of New York*, 156 AD2d 641 [1989]) and that the diagnosis of mental disorders and the treatment of associated mental, emotional and behavioral symptoms have been held to be "within the scope of practice of the professions of psychology" (quoting *People v R.R.*, 12 Misc 3d 161, 202 [2005]; *see also Matter of Nicole V.*, 71 NY2d 112, 121 [1987] [social worker's testimony that child suffered from sexually abused child syndrome properly received to corroborate child's out-of-court statements]).

Following oral argument, Supreme Court granted defendant's motion in limine, ruling that while a neuropsychologist is permitted to give testimony concerning a TBI, the absence of evidence by the qualified expert to make the "critical connection" between the psychologist's testimony and the TBI renders the testimony "useless." Plaintiffs then moved for a continuance, since Dr. Goldberg was the only medical expert scheduled to testify on behalf of plaintiffs, and defendant cross-moved for a directed verdict dismissing the complaint. The court denied plaintiffs' motion and granted defendant's motion for a directed verdict.

On appeal, the parties offer arguments based on divergent evidentiary criteria. Plaintiffs purport to offer authority for the proposition that a neuropsychologist is a competent witness to give evidence concerning the effects—and even the cause—of neurological impairments. Defendant, on the other hand, argues that plaintiffs were unable to establish a foundation for the evidence they sought to elicit from their expert witness.

Before accepting expert testimony, a trial court is required to conduct a two-step analysis. First, it must confirm that the methodology used by the expert to arrive at a conclusion is generally regarded as reliable by the scientific community (*see Frye v United States*, 293 F 1013 [1923]; *People v Middleton*, 54 NY2d 42, 49 [1981]). Second, the court must establish the "admissibility of the specific evidence—i.e., the trial foundation" (*People v Wesley*, 83 NY2d 417, 428 [1994]). The latter inquiry is made

"at the trial and is the same as that applied to all evidence, not just to scientific evidence" (*id.* at 429). Thus, admissibility is a distinct evaluation, involving "matters going to trial foundation or the weight of the evidence, both matters not properly addressed in the pretrial *Frye* proceeding" (*id.* at 426).

In view of the parties' disparate appellate arguments, it is appropriate to first consider what exactly the trial court decided. It is significant that the motion was interposed following jury selection, indicating that it was not defendant's intention to bring on a *Frye* hearing (*see id.*). In its moving papers, defendant contended that Dr. Goldberg

> "is claiming/diagnosing that the plaintiff has suffered a closed head Traumatic Brain Injury (TBI) . . . No where [*sic*] in his expert disclosure, reports or his background does Dr. Goldberg exhibit the basis to do so and as such should be precluded from relating his psychological test findings to a medical diagnosis of brain injury" (citing *Romano v Stanley*, 90 NY2d 444 [1997] [forensic pathologist unqualified to render opinion as to the "visible intoxication" elements of the Dram Shop Act; affidavit devoid of foundational scientific basis]).

Thus, it is clear that the court's disposition of the motion was founded upon the lack of evidentiary basis for the expert witness's proposed testimony.

At oral argument, the court perceived at the outset that it was being asked to render a decision "as to causation." Plaintiffs clearly did not agree, stating that "what we're doing now is a *Frye* hearing," to which the court responded, "This is not a *Frye* hearing." The court made it quite plain that the sufficiency of Dr. Goldberg's qualifications and the cognitive function testing he performed were not at issue, stating, "I have no problem with Dr. Goldberg testifying and I know what he's going to testify to." The court then summed up plaintiffs' argument, stating: "You're saying Dr. Goldberg can say there's a deficiency and that I believe that deficiency was caused by the incident of June '01 as opposed to any other incident or some other reason that people have cognitive deficits."

The court granted defendant's motion, ruling that plaintiffs' expert witness is "only qualified to testify as to the effects of a brain injury." The court noted, "There are other events that could possibly be the cause of a brain injury but at this point we don't even have evidence that there was a brain injury." Defen-

dant then moved for a directed verdict, which the court granted, stating that, as a result of its ruling, plaintiffs "would not be able to make [out] a prima facie case."

Contrary to plaintiffs' assertions, the trial court did not preclude Dr. Goldberg's testimony as to the issue of causation because he lacks a medical degree. Indeed, the record is quite clear that the court based its ruling on the absence of any objective medical foundation to support Dr. Goldberg's testimony, and not on his lack of qualification.

Plaintiffs obfuscate the issue on appeal by continuing to promote the qualifications of their expert in support of their position that he is qualified to offer an opinion that the accident of June 16, 2001 was the proximate cause of the infant plaintiff's neurological deficits. They restate the argument advanced at trial—that the lack of a medical degree does not preclude their witness from giving expert testimony on a medical question within his area of proficiency. They quote *Steinbuch v Stern* (2 AD3d 709, 710 [2003]), which they contend is "exactly on point," for the proposition that " '[t]he court was required to assess his qualification as an expert based upon his professional background, training, study, and experience.' "

This Court has recognized that a medical opinion can be received from a witness who, though lacking a medical degree, is properly qualified by training and experience (*Karasik v Bird*, 98 AD2d 359, 362-363 [1984]). However, from the record at oral argument, it is apparent that the court found no reason to conduct a *Frye* hearing to determine the reliability of the proffered evidence and the methodology on which it depends or to inquire into the professional qualifications of the witness to offer expert testimony. Nevertheless, plaintiffs persist in arguing the merits of an issue the trial court categorically stated it was not deciding—their expert's qualification to give testimony with respect to a head injury.[1] As the court observed, defendant had "moved to preclude Dr. Goldberg from testifying as to causation only." In order to decide the motion, the court was required to go beyond the threshold question, embraced by plaintiffs, of

---

1. A neuropsychologist has been found qualified to give testimony concerning the extent of the impairment resulting from a brain injury (*Chelli v Banle Assoc., LLC,* 22 AD3d 781, 783 [2005], *lv denied* 7 NY3d 703 [2006]; *see also Matter of Nichols v Colonial Beacon Oil Co.,* 284 App Div 581, 585 [1954] [Workmen's Compensation Board accepted testimony from a neuropsychologist concerning contribution of postoperative medications, including whiskey, to death resulting from delirium tremens following hernia surgery]).

whether the witness was qualified to testify and consider the evidentiary issue of whether, "in opining as to causation and prognosis, [the witness] exhibited a degree of confidence in his conclusions sufficient to satisfy accepted standards of reliability" (*Matott v Ward*, 48 NY2d 455, 459 [1979]).

As to the threshold inquiry, the determination of whether a witness is qualified to give expert testimony is entrusted to the sound discretion of the trial court, the provident exercise of which will not be disturbed absent a serious mistake or an error of law (*Meiselman v Crown Hgts. Hosp.*, 285 NY 389, 398-399 [1941]). Plaintiffs do not claim that Supreme Court erred in accepting, without discussion, Dr. Goldberg's qualification as an expert witness, and we discern no basis to examine the issue sua sponte.

For purposes of this appeal, this Court therefore assumes, without deciding, that based on tests administered to the infant plaintiff, Dr. Goldberg is qualified to render an opinion that the type and extent of cognitive impairment indicated by his interpretation of the test results are consistent with cognitive impairment associated with injury normally resulting in TBI. The issue to be resolved is whether the evidence relied upon by the expert is sufficient to provide a foundation for his opinion that plaintiff's neurological impairments were proximately caused by the injuries sustained as a result of the particular negligence attributed to defendant, rather than by another incident in which plaintiff experienced head trauma or even by psychosocial and other factors entirely unrelated to injury.[2]

■ With respect to the admissibility of the expert's testimony, it is apparent that plaintiffs have identified no procedures actually employed by their neuropsychologist that would enable him to offer a reliable causation opinion based on accepted methodology (*see Parker v Mobil Oil Corp.*, 7 NY3d 434, 447 [2006]). "It is settled and unquestioned law that opinion evidence must be based on facts in the record or personally known to the witness" (*Cassano v Hagstrom*, 5 NY2d 643, 646 [1959]), with limited exceptions not applicable here (*People v Sugden*, 35 NY2d 453, 460-461 [1974]). In the absence of record support, an expert's opinion is without probative force (*Amatulli v Delhi Constr. Corp.*, 77 NY2d 525, 533 [1991]). Even assuming, as plaintiffs contend, that Dr. Goldberg is qualified to definitively

2. The record indicates that plaintiff "has a history, dating from at least 1998, of academic and cognitive deficits."

state that plaintiff's neurological deficits are the result of trauma so as to rule out genetic, perinatal and psychosocial causes, plaintiffs have failed to identify any evidence and accepted methodology that would permit their expert to state, within "accepted standards of reliability" (*Matott*, 48 NY2d at 459), that those deficits are the result of one traumatic incident as opposed to another, or even to rule out nontraumatic causes or the cumulative effect of the series of head traumas sustained by plaintiff.

Dr. Goldberg failed to offer or identify any objective medical evidence to support his conclusion that plaintiff's alleged brain injury and resulting cognitive problems were caused by the incident in question. The expert witness first examined plaintiff and administered neuropsychological tests on June 17, 2004, three years after the injury alleged to have been sustained as a result of the collapse of the bathroom ceiling. The report dated June 21, 2004 does not identify any earlier testing used as a basis for the expert's conclusion that "the accident suffered in 2001 is the direct and proximal cause of the cognitive deficit documented in this evaluation." Particularly, the report does not refer to any assessment of plaintiff's cognitive function made before the June 2001 incident that might serve as a basis for comparison so as to support the attribution of the noted deficits to events subsequent to the assessment, even if not to the June 2001 incident itself. A later evaluation made by plaintiffs' expert in October 2006 merely notes, "A clinically significant cognitive deficit is still present." It does not even mention the September 2004 car accident, let alone attempt to assess its effect on plaintiff's cognitive function. Moreover, when faced with objective medical evidence indicating the absence of brain injury, such as negative CT scans, plaintiffs' expert dismissed it without sufficient explanation. In fact, all CT scans taken in connection with injuries sustained by plaintiff resulted in negative findings. Nor did Dr. Goldberg adequately address evidence showing that plaintiff's cognitive difficulties predated the subject accident.

The deficient evidentiary foundation offered in support of the proposed testimony of plaintiffs' expert witness should be contrasted to another matter likewise involving successive injury to the plaintiff, in which it was observed that:

> "the doctor had played an intimate role in the medical history of the case. He was the treating physician. His was the advantage of a prompt postacci-

dent examination. In the course of his repeated treatment, he had the opportunity to note the refinements and subtleties of his patient's progress. He had personally observed the nature and extent of each of the exacerbating incidents in determining their effect on his diagnosis and treatment; he bore the responsibility for determining their relationship to the pre-existing symptoms. He had also undertaken a current medical survey on the eve of trial himself. In sum, if any one was in a position to hold an informed opinion, it was Dr. Millard" (*Matott*, 48 NY2d at 462).

The expert witness in the instant matter lacks the close connection with plaintiff's treatment that might permit a reliable assessment of the extent to which a particular traumatic event or nontraumatic factors contributed to the noted cognitive impairment. Thus, Supreme Court properly decided that plaintiffs' expert failed to establish a sufficient evidentiary foundation with respect to causation.

As the Court of Appeals stated in *Bernstein v City of New York* (69 NY2d 1020, 1021-1022 [1987]):

"A jury verdict must be based on more than mere speculation or guesswork. Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury. If there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for which the defendant was responsible" (citations and internal quotation marks omitted).

In the absence of any other witness competent to establish the requisite nexus between the incident of June 2001 and the injury alleged to have resulted, there is no nonspeculative basis on which a jury could decide that defendant is responsible for Tyrone Guzman's neurological impairments (*see Taub v Art Students League of N.Y.*, 39 AD3d 259 [2007]). Thus, Dr. Goldberg's reports regarding plaintiff, which conclude that plaintiff's cognitive disabilities were the result of injury sustained on June

16, 2001, are not based on any objective medical testimony and were properly precluded by the court.

■ Plaintiffs, however, contend that the court abused its discretion in denying their motion for a continuance pursuant to CPLR 4402 to enable them to retain a medical expert to testify concerning causation. The decision whether to grant a continuance is a matter within the sound discretion of the trial court (*Matter of Sakow*, 21 AD3d 849 [2005], *lv denied* 7 NY3d 706 [2006]; *Telford v Laro Maintenance Corp.*, 288 AD2d 302, 303 [2001]) and should not be disturbed absent a clear abuse of that discretion (*Sakow*, 21 AD3d at 849; *Balogh v H.R.B. Caterers*, 88 AD2d 136, 143 [1982]). However, "[i]t is an abuse of discretion to deny a continuance where the application complies with every requirement of the law and is not made merely for delay, where the evidence is material and where the need for a continuance does not result from the failure to exercise due diligence" (*Balogh*, 88 AD2d at 141).

Here, plaintiffs' request for a continuance was not the result of their failure to exercise due diligence. To the contrary, they were without an expert witness upon the commencement of the trial because the trial court entertained defendant's motion in limine made after jury selection. As plaintiffs' counsel argued in support of his application, had defendant's motion been made prior to jury selection, plaintiffs would have had the opportunity to obtain another expert witness. Further, any resulting delay or waste of judicial resources would not have been the fault of plaintiffs because, but for defendant's motion in limine, they were prepared for trial.

Accordingly, the judgment of the Supreme Court, Bronx County (Betty Owen Stinson, J.), entered on or about May 20, 2007, dismissing the complaint and bringing up for review an order of the same court and Justice, entered April 2, 2007, which granted defendant's motion in limine to preclude plaintiffs' expert from testifying, directed a verdict in defendant's favor dismissing the complaint, and denied plaintiffs' motion for a continuance, should be reversed, on the law, the facts and in the exercise of discretion, without costs, the judgment vacated, the motion for a continuance to obtain a medical expert granted, and the matter remanded for further proceedings. The appeal from the aforesaid order should be dismissed, without costs, as superseded by the appeal from the judgment.

SAXE, J. (dissenting in part). It is astonishing that our rules of evidence have been employed to dismiss the lawsuit of a child who *indisputably* was hit in the head and rendered temporarily unconscious or semiconscious by a large chunk of falling ceiling, who has since that time suffered a variety of symptoms—sharp, throbbing headaches as well as back and neck pain—and has displayed memory impairments and an inability to focus and pay attention. According to a qualified neuropsychologist, testing has shown various forms of "clinically significant cognitive deficits" that are indicative of, or consistent with, closed-head brain injury. Yet, because this clinician did not indicate *in his report* how he arrived at the conclusion that the injury he found had been caused by defendant's negligence, the trial court granted defendant's in limine motion to preclude him from testifying and dismissed plaintiffs' action. The majority does not challenge the evidentiary ruling, disagreeing instead only with the dismissal and concluding that plaintiffs should have been given more time to obtain another expert's opinion. However, I take issue with the preclusion of the expert's testimony. Under these circumstances, the question of whether the expert may properly offer his opinion both as to the presence of brain injury and as to the causation of that injury should have been left to trial.

Furthermore, the timing of the motion and decision are shocking; at the end of the court day following the completion of jury selection and pretrial proceedings on March 26, 2007, plaintiffs' counsel was presented with this thoroughly prepared motion in limine including 15 exhibits and a legal analysis that had to be responded to immediately. He was required to counter the legal analysis, without even time to collect and submit any relevant exhibits, such as any deposition testimony, perhaps by the child or his mother, setting forth their firsthand experience or observations of the nature and extent of the changes in Tyrone since the accident. The record on appeal is appallingly one-sided, essentially consisting of the pleadings, defendant's submissions on its motion, and the in-court colloquy, with plaintiffs' opposition limited to a two-page "Brief in Opposition."

Defendant's motion in limine to preclude the testimony of plaintiffs' expert should not have been granted in any respect. While I agree with my colleagues that the judgment in defendant's favor should be vacated and the matter remanded, I would reverse the ruling in its entirety so as to permit the testimony of plaintiffs' expert without limitation.

## Facts

On June 16, 2001, plaintiff Tyrone Guzman, then age 11, was struck in the head and neck by a falling chunk of the bathroom ceiling. He was found by his mother supine on the floor in a semiconscious state with ceiling plaster debris all around him. He indicated that his back and neck hurt. A cervical spine X ray and CT scan were taken, and their results were reported to be negative. Plaintiff was discharged from the hospital approximately three hours after he arrived, at which time he was ambulatory and alert; he was given follow-up instructions for head injury.

Apparently—although, because of the state of the record, this can only be asserted based upon multiple hearsay gleaned from reports submitted by defendant as exhibits—Tyrone was given little to no follow-up care in the months that followed. Notably, however, he was from that time on excused from gym classes, indicating that all was not well with him physically. A number of the reports mention that throughout the months that followed Tyrone suffered from frequent sharp and throbbing headaches, sometimes with blurred vision, for which he was treated with Tylenol unless the pain was so severe as to cause him to cry, at which point he would be given Motrin. He also reported experiencing dizziness, even from merely bending over to tie his shoes, along with other ongoing problems such as the neck and back pain.

In early 2002, Tyrone was sent for follow-up care to Neuro Care Associates, where he apparently received physical therapy, including a program of muscular relaxation, focused deep breathing and "muscle awareness techniques." However, it appears—again, through hearsay—that his treatment was discontinued due to "transportation difficulties." Testing in March 2002 revealed a normal EEG and normal brainstem auditory evoked response, although a needle electromyography of the cervical spine and related upper limbs suggested the presence of soft tissue injury.

In September 2002, upon his attorney's referral, Tyrone was examined by Dr. Joseph Waltz, a neurologist. In the "Impression" section of his report, dated October 8, 2002, Dr. Waltz stated that plaintiff suffered from post-traumatic headaches, cervical radiculopathy, and lumbosacral radiculopathy.

In October 2002, plaintiffs commenced this negligence action against defendant, the owner of the premises in which the accident occurred. On June 17, 2004, plaintiffs' counsel had Ty-

rone examined by Elkhonon Goldberg, Ph.D., a board-certified neuropsychologist whose main area of expertise is disorders due to traumatic brain injury. Dr. Goldberg reviewed information provided by Tyrone and his mother, and conducted an extensive battery of neuropsychological tests. It is worth mentioning that Dr. Goldberg reported that during the battery of tests, Tyrone began to experience headaches and vomited, and he also became quite somnolent at one point.

From the results of his testing Dr. Goldberg concluded:

> "The documented neuropsychological pattern is consistent with the history of head trauma and indicates a clinically significant cerebral dysfunction with a particular impact of the left hemisphere.

> "It is my professional opinion that the accident suffered in 2001 is the direct and proximal cause of the cognitive deficit documented in this evaluation. Given the amount of time elapsed since the accident, a long-term, permanent cognitive deficit is likely to persist and it will continue to interfere with Tyrone's education . . . since it affects language, the primary medium of any educational process; as well as attention, the primary prerequisite of any successful educational process."

A repeat neuropsychological evaluation was performed by Dr. Goldberg on October 24, 2006, and in his follow-up report Dr. Goldberg reviewed the battery of tests performed on Tyrone and the nature of the cognitive deficits he found. He reaffirmed his prior conclusion that Tyrone displayed cerebral dysfunction consistent with the head trauma.

Plaintiffs' supplemental bill of particulars indicates that Tyrone's injuries included impairments in memory, attention, concentration, and communication skills, although the sparse record contains no submission from Tyrone's mother, teachers, or others with a long-term relationship with him, as to their observations regarding this claim of deterioration of his mental capabilities since the accident.

Plaintiffs' CPLR 3101 (d) response designating Dr. Goldberg as their expert, to testify as to Tyrone's cognitive deficits, the consequences of those deficits, and the causation of those deficits, was served on January 16, 2007. In an addendum dated January 25, 2007 and served on January 29, 2007, Dr. Goldberg challenged the assessment of defendant's

expert neurologist, Dr. David Kaufman, who had concluded that Tyrone displayed no objective signs of cognitive impairment. Dr. Goldberg questioned the validity of Dr. Kaufman's assessment by asserting that "a neurological evaluation contains only a very brief and cursory assessment of cognition and is neither intended nor capable of providing a comprehensive assessment of cognitive function or dysfunction." He also responded to the contention that Tyrone had the same cognitive deficits prior to the accident, as evinced by earlier school assessments, with the explanation that Tyrone's pre-accident difficulties in school related to "behavioral dyscontrol and emotional dysregulation," while his cognitive language and memory functions at that time were within normal range. In contrast, his present difficulties, post-accident, implicated problems with verbal memory, language and attention. He added that although measurements of Tyrone's IQ before and after the accident were similar, the WISC IQ tests that were used "are notoriously weak in measuring attention and are particularly inadequate for measuring memory. Therefore, they are not sensitive to the kind of deficit that characterizes [Tyrone's] cognitive impairment and would not have been able to document any changes in his attention and particularly in his memory."

Defendant then obtained an additional opinion of another neurologist, Dr. William Head, on February 7, 2007. Dr. Head reviewed all the available records, along with Dr. Goldberg's reports, and came to conclusions similar to those of Dr. Kaufman, albeit in much greater detail.

When the case was set for trial on March 26, 2007, following jury selection, the court considered various oral applications, such as a request for a missing witness charge and a request for a ruling that defendant's two experts would provide cumulative testimony. Then, defendant made what it characterized as an in limine motion, for which it had prepared formal written papers, to preclude the testimony of plaintiffs' expert, Dr. Goldberg.

That same day, the trial court reviewed the papers submitted by defendant's counsel, heard argument, and indicated its agreement with defendant's position; then, explaining that it viewed the motion as dispositive, it put the matter over to the next morning to give plaintiffs' attorney time to counter the arguments "on the limited issue of whether or not Doctor Goldberg, a [Ph.D.] psychologist[,] is qualified to testify as to the causa-

tion of the deficits that he found in the plaintiff Tyrone Guzman.''

The next day, plaintiffs' counsel emphasized in his argument that a neuropsychologist is qualified to offer an opinion regarding brain injury, while the trial court countered that such an expert may testify only as to the effects of a brain injury, but not as to the existence of a brain injury, where there is no medical evidence establishing such brain injury. It concluded that Dr. Goldberg was precluded from testifying as to the cause of the deficits he found, in the absence of objective medical evidence of brain injury. It then dismissed the action in its entirety on the ground that without the expert's testimony as to causation, plaintiffs could not make out a prima facie case.

## Analysis

In holding that the trial court's ruling should be modified, the majority explains that the court's decision was proper to the extent that Dr. Goldberg's testimony lacked a sufficient evidentiary foundation. That is, it holds that there is nothing in' the record permitting Dr. Goldberg to causally connect the results of his testing with the incident of June 2001. It asserts that plaintiffs have failed to identify any procedures employed by Dr. Goldberg that would enable him to offer a reliable causation opinion based on accepted methodology, or to identify any evidence permitting him to state, within ''accepted standards of reliability,'' that Tyrone's cognitive deficits are the result of the June 2001 incident, as opposed to some other incident(s) or some nontraumatic causes.

As the majority recognizes, Dr. Goldberg is certainly qualified to render an opinion that the type and extent of cognitive impairment indicated by his interpretation of the test results are consistent with traumatic brain injury. It nevertheless concludes that Dr. Goldberg lacked a basis to support his conclusion that it was *this particular* incident that caused the injury resulting in the observed impairments. Indeed, it assumes an absence of any other witness competent to establish the nexus between the 2001 incident and the injury.

I fail to understand why dismissal at this juncture was considered appropriate on this reasoning. First of all, the court did not consider the possibility of seeking testimony by Dr. Goldberg before deciding this purported ''in limine'' motion, so of course it had no evidence as to the science he employed.

Therefore, it is not surprising that the record fails to establish that which the majority demands, namely, an explanation of the "procedures actually employed by [Dr. Goldberg] that would enable him to offer a reliable causation opinion based on accepted methodology."

Second, it was not proper to preclude Dr. Goldberg's expected testimony based upon the lack of an "objective medical foundation" for the claim of traumatic brain injury. That Tyrone's claimed traumatic brain injury was not established through a positive CT scan does not establish as a matter of law the nonexistence of any such injury. There is no reason Dr. Goldberg should not be permitted to testify that the presence of brain injury may be deduced from the results of the tests he performed. Defendant, in its motion papers presented to the trial court, relied upon *Toure v Avis Rent A Car Sys.* (98 NY2d 345, 350 [2002]), in which the Court of Appeals focused on the need of "objective medical proof" for a plaintiff *"to meet the 'serious injury' threshold under the No-Fault Law"* (emphasis added). That case focused entirely and solely on the No-Fault Law. It does not preclude a plaintiff in a personal injury action from establishing the existence of traumatic brain injury through results of neuropsychological testing combined with observations of people who know the plaintiff as to alterations in him since the accident.

Of course, an expert may not testify to a conclusion which assumes material facts that are not supported by the evidence (*Cassano v Hagstrom*, 5 NY2d 643, 646 [1959]). But, notably, in *Cassano* it was at the close of the plaintiff's case that the trial court determined that the expert had assumed facts that were not established by the evidence. Dr. Goldberg should not be faulted for failing to explain his reliance on certain facts when he was never given the opportunity to testify as to the facts on which he based his conclusion. Third, as to proving that the claimed injury was caused by the ceiling collapse, that connection may be made by others linking perceived alterations in Tyrone's cognitive function to the date of the accident. Yet plaintiffs did not even have the opportunity to present evidence from people who knew Tyrone well and may have observed pronounced alterations in his skills and abilities following the 2001 accident, which evidence could also have supported the conclusion that the observed cognitive deficits were causally related to the accident.

The suggestions that Tyrone had cognitive problems even before the 2001 incident, and that his cognitive problems could have been caused by accidents other than the 2001 incident, are valid and viable grounds for challenging the opinion of Dr. Goldberg. But, these challenges go to the weight of his proposed testimony, not its admissibility. By the same token, the defense should not be permitted to establish an absence of evidence of a causative link between the accident and Tyrone's post-accident cognitive deficits simply by claiming that testimony by Tyrone's mother must necessarily be fatally flawed.

It should go without saying that the preclusion of Dr. Goldberg's opinion may not be appropriately attributed to the fact that Tyrone was so unlucky as to be subjected to several, rather than merely one, incident potentially causing him injury. True, plaintiffs must establish that the injury was caused, in whole or in part, "by a cause for which the defendant was responsible" (*Bernstein v City of New York*, 69 NY2d 1020, 1022 [1987] [citation and internal quotation marks omitted]). But, both the facts and the posture of the present case are widely different from those in *Bernstein*. It is one thing to dismiss a complaint upon review of a trial record and a conclusion that there is *no* evidence supporting the factual conclusion the jury had to reach to justify the verdict. It is another to dismiss a case *before trial* by concluding, based upon an expert's report, that the expert cannot make a causal connection between the accident and the injury, and to further conclude that there can be no other means of establishing that causal connection.

As to the one event intervening between the incident in question and Dr. Goldberg's first evaluation of Tyrone, i.e., Tyrone's being hit in the head with a basketball in May 2002, there is nothing to indicate that from that point on there was an increase or alteration in the symptoms of injury that Tyrone began to display in June 2001 and that continued unabated through and after the incident in May 2002. As to the car accident in 2004, any injuries it caused do not negate the damage caused by the 2001 incident, which in any event were assessed before the car accident.

In *Matott v Ward* (48 NY2d 455 [1979]), the Court upheld a ruling allowing the plaintiff's osteopathic physician, whom the plaintiff saw intermittently over the years following his accident, to offer his opinion that the plaintiff's subsequent complaints of new orthopedic injuries to parts of his body af-

fected by the original accident were causally related to the original accident. The question focused on by the Court was not whether this expert could properly make that determination; it was simply whether he asserted the requisite level of "reasonable certainty." It would have been appropriate here to leave for trial any challenge to Dr. Goldberg's conclusion that all Tyrone's injuries were caused by the single event in 2001; however, it was not appropriate to prevent Tyrone's case from being presented.

Even if Dr. Goldberg's reports failed to sufficiently establish the basis upon which he concluded that the accident in question had caused the asserted cognitive deficits, there are more appropriate alternatives than dismissal of the complaint prior to trial. The court had the option of assessing at the close of plaintiffs' case whether causation evidence had been presented to connect the injury observed by Dr. Goldberg with the incident and its repercussions as observed by Tyrone's family and friends; it also had the option of instructing the jury as to the limited use it could make of Dr. Goldberg's opinion evidence. Dismissal was, at the very least, premature, as was the conclusion that Dr. Goldberg's proposed testimony was insufficiently connected to the incident.

I cannot help but observe that if Tyrone had been born into a different family, more steps might have been taken immediately to assess and clearly document any changes in Tyrone's abilities following the accident, with a multitude of experts' evaluations and ongoing reviews of his progress or lack of it. It is a disgrace if a lack of follow-up that may be attributable to a lack of funds or education prevents Tyrone from establishing that he suffered from debilitating injury either wholly or partially resulting from being hit in the head due to defendant's negligence.

Finally, because of the one-sided procedure by which this application was made and granted, and because it seems likely that plaintiffs can present a sufficient evidentiary basis to claim that Tyrone has suffered cognitive impairment as a result of the 2001 accident, I would reverse the trial court's ruling and deny defendant's in limine motion, and remand this matter for immediate trial.

BUCKLEY, GONZALEZ and CATTERSON, JJ., concur with TOM, J.P.; SAXE, J., dissents in part in a separate opinion.

Judgment, Supreme Court, Bronx County, entered on or about May 20, 2007, reversed, on the law, the facts and in the exercise

of discretion, without costs, the judgment vacated, the motion for a continuance to obtain a medical expert granted, and the matter remanded for further proceedings. Appeal from order, same court, entered April 2, 2007, dismissed, without costs, as superseded by the appeal from the judgment.