■ In the Matter of DENNIS J. LATERZA, Petitioner, v NEW YORK STATE RACING & WAGERING BOARD, Respondent. [892 NYS2d 253]—

Spain, J.

Petitioner, licensed by respondent to own and train race horses since 1973, was the trainer of record for a horse named "Lemon Pepper," which competed in the ninth race at Yonkers Raceway on April 27, 2007, finishing in third place. Acting on a tip from a police informant, respondent's director of investigations requested the presiding judge at Yonkers Raceway to order that post-race double blood and urine samples be taken from Lemon Pepper and tested for the presence of recombinant human erythropoietin (rhEPO) or Darbepoietin-alfa (DPO) (hereinafter collectively referred to as rhEPO/DPO). These chemically engineered drugs—which mimic the naturally produced human EPO hormone that has the ability to increase red-blood cell production and its consequent increased oxygenation—are *not* specifically permitted to be administered to horses (*see* 9 NYCRR 4120.2 [a]-[g]). As such, the governing rules provide that they "may [not] be administered by any means within one week of the scheduled post time of the race in which the horse is to compete" (9 NYCRR 4120.2 [h]). Under the "trainer responsibility rule," a trainer is held strictly responsible for any

positive drug test unless the trainer can refute by substantial evidence that neither the trainer nor his or her employee or agent was responsible for the administration of the drug or restricted substance (*see* 9 NYCRR 4120.4; *see also Matter of Mosher v New York State Racing & Wagering Bd.*, 74 NY2d 688, 689-690 [1989]; *Matter of Casse v New York State Racing & Wagering Bd.*, 70 NY2d 589, 594-597 [1987]; *Matter of Zito v New York State Racing & Wagering Bd.*, 300 AD2d 805, 806 [2002], *lv denied* 100 NY2d 502 [2003]).

George Maylin, professor of toxicology at the New York State College of Veterinary Medicine at Cornell University and Director of the New York State Equine Drug Testing and Research Program, conducted an ELISA[1] antibody screening test on the blood sample. The test revealed that the blood sample had an immuno response to an EPO antibody, indicating that rhEPO/DPO may have been present, but he did not have the means to confirm the actual presence of this restricted substance. To confirm the actual presence of rhEPO/DPO, Maylin was authorized by respondent to send a separate sample to Cornelius Uboh, Bureau Director of the Pennsylvania Equine Toxicology and Research Laboratory, for testing.[2] Uboh, employing a sequence of well-established scientific tests that he and his research colleagues had devised to recover and identify rhEPO/DPO from an equine blood sample, confirmed that the blood sample contained that substance. Based upon Uboh's confirmatory test, Maylin advised respondent of the positive result.

In October 2007, the presiding judge at Yonkers Raceway concluded that petitioner had violated 9 NYCRR 4120.2 (h) (administering drug, not authorized, within one week of race) and 9 NYCRR 4120.4 (the trainer responsibility rule), suspended him for five years and imposed a $2,500 fine. On petitioner's administrative appeal, hearings were held at which, among others, Maylin and Uboh testified as to their blood test procedures and findings; petitioner also testified, denying ever administering rhEPO/DPO to Lemon Pepper or any knowledge of who may have done so. The Hearing Officer issued a report recommending that petitioner had violated the cited rules, and respondent affirmed the findings and penalties. Petitioner commenced this CPLR article 78 proceeding in Supreme Court, which signed a stay of the suspension order and transferred the proceeding to this Court.

---

1. ELISA stands for enzyme-linked immunosorbent assay.

2. Respondent did not act in excess of its jurisdiction by utilizing Uboh's Pennsylvania laboratory to conduct the confirmatory tests on which Maylin relied (*see* Racing, Pari-Mutuel Wagering and Breeding Law § 902 [1]; 9 NYCRR 4120.1 [b]).

We reject petitioner's primary claim in this special proceeding, that respondent erred in admitting Uboh's report and testimony into evidence. At the hearing, petitioner objected to the admission of Uboh's opinion, arguing that it was based upon novel scientific methods that must be analyzed under the *Frye* standard followed in New York for admissibility of scientific evidence, i.e., acceptance as reliable by the relevant scientific community (*see Frye v United States*, 293 F 1013 [DC Cir 1923]; *see also Parker v Mobil Oil Corp.*, 7 NY3d 434, 446-447, 447 n 3 [2006]; *People v Wesley*, 83 NY2d 417, 423 [1994]). Because Uboh used generally accepted scientific methodology—which generated results accepted as reliable within the scientific community—to confirm the presence of rhEPO/DPO, it is unnecessary to address the application of the *Frye* standard in administrative proceedings and we decline to do so.

To greatly simplify, Uboh testified that, using commercially purchased antibodies as magnets to attract the rhEPO/DPO and separate it from horse plasma (immuno affinity separation), he washed off and recovered the substance itself (from the antibodies) and analyzed it using a mass spectrometer (LC-MS/MS instrument), which broke the substance down into peptides at specific points using enzymes (tryptic digestion); he then confirmed that the peptides were the prohibited substance using an internationally recognized database (to identify peptides that do not occur naturally in horses). Maylin testified that all of these techniques were scientifically accepted, that immuno affinity separation was "widely used in protein chemistry," that tryptic digestion was a process "used for 35 years," and that the mass spectrometer was "widely used" in the study of proteins, but very expensive and rare.[3] Uboh testified that it was the use of this mass spectrometer instrument for this purpose that was a first. Further, it was established at the hearing that Uboh's technique—developed after four years of collaborative research—had been published in a peer review scientific journal in June 2007, shortly after this race, and further refined in an April 2008 article published just before his testimony.[4]

Under the circumstances here, we are not persuaded that the

---

3. Maylin explained that Uboh's techniques were "generic" and should be "valid and reproducible," but his lab at Cornell did not have the mass spectrometer required to duplicate the process.

4. Petitioner's challenges to the reliability of Uboh's testing techniques did not undermine the admissibility of the evidence but, instead, went to the weight to be accorded such evidence and created factual and credibility issues for the Hearing Officer to resolve (*see Matter of Case v New York State Racing & Wagering Bd.*, 61 AD3d 1313, 1314 [2009], *lv denied* 13 NY3d 705 [2009];

Hearing Officer erred in ruling that a *Frye* hearing was not required, given the uncontroverted expert testimony that Uboh, while the first to employ LC-MS to confirm the presence of rhEPO/DPO in horses, relied upon tests and instruments whose reliability were well established and commonly relied upon, and which produced results accepted as reliable, in the relevant scientific community.[5] We also find that a proper foundation was provided establishing the reliability of the testing procedures used by Uboh to recover the substance from the blood sample and confirm its identity (*see People v Middleton*, 54 NY2d 42, 45 [1981]; *see also People v Wesley*, 83 NY2d at 435-436, 436 and n 2 [Kaye, Ch. J., concurring]; *cf. Guzman v 4030 Bronx Blvd. Assoc. L.L.C.*, 54 AD3d 42, 47-51 [2008]).

Turning to our review of the determination, we find that respondent submitted substantial evidence that the horse's blood tested positive for rhEPO/DPO. However, the record fails to establish, as required, that it was administered within the seven-day proscribed period (*see* 9 NYCRR 4120.2 [h]). Indeed, Maylin was unable to independently determine, based upon the tests he performed, how recently the substance had been administered prior to the race. While Uboh testified that he had not been able—using his methodology—to confirm the presence of this substance outside of seven days and opined to a reasonable degree of scientific certainty that the substance had been administered within seven days of the race, his testimony did not sufficiently disclose the basis for that latter conclusion. Respondent never elicited from Uboh how he was able to determine that rhEPO/DPO was administered within the seven days. Significantly, the record reflects that respondent retained Uboh solely to confirm the presence of this substance and not to ascertain the timing of when it was administered. It also appears that Uboh was first informed at the hearing—during cross-examination—of New York's seven-day rule for this substance, which differs from Pennsylvania's zero tolerance rule. Uboh's report, admitted into evidence, did not offer an opinion as to the timing of when the substance was administered

*see also Jackson v Nutmeg Tech., Inc.*, 43 AD3d 599, 601-602 [2007]). Likewise, petitioner's denials, at most, created a credibility issue (*see Matter of Sachs v New York State Racing & Wagering Bd., Div. of Harness Racing*, 1 AD3d 768, 772 [2003], *lv denied* 2 NY3d 706 [2004]).

   **5.** Petitioner's due process claim is also meritless (*see* 9 NYCRR 5402.5; *see also Casse v New York State Racing & Wagering Bd.*, 70 NY2d at 593-594), and the fact that there was no other known laboratory capable of conducting a duplicate confirmatory test on the sample did not operate to deprive him of due process of law (*see Matter of DeVaux v New York State Racing & Wagering Bd.*, 158 AD2d 892, 893 [1990], *appeal dismissed* 76 NY2d 772 [1990]).

here. Questioning of Uboh at the hearing established that he had, in his recently published research article on these testing techniques for this substance, been able to detect and possibly confirm the presence of the substance in horses *more than* seven days after its administration, depending upon the dose given and other factors. Moreover, Uboh testified that he did not attempt to ascertain the *quantity* or dose of the substance administered here to Lemon Pepper. Thus, given that respondent failed to lay a foundation for Uboh's ultimate conclusion on the timing, we find that respondent failed to adduce proof that this substance was administered within the requisite time frame and the determination cannot be sustained.

Petitioner's remaining claims need not be addressed in light of the foregoing.

Peters, J.P., Lahtinen, Kane and Malone Jr., JJ., concur. Adjudged that the determination is annulled, without costs, and petition granted.