McCarthy, J.
Appeal from a judgment of the Supreme Court (Powers, J.), entered August 15, 2011 in Schenectady County, which granted petitioners’ application, in a proceeding pursuant to CPLR article 78, to annul a certain regulation promulgated by respondent.
In 2009, respondent[1] adopted regulations that prohibited the use of certain performance enhancing substances in racehorses, and permitted respondent to drug test all racehorses under the care or control of a trainer licensed by respondent that are anticipated to compete in a race at a New York racetrack within six months (see 9 NYCRR 4043.12, 4120.17). Petitioners, who are individual licensed owners and trainers of harness race *1072 horses and a nonprofit organization of licensed owners, trainers and drivers of harness racehorses, thereafter commenced this CPLR article 78 proceeding challenging the regulation applicable to harness racing (see 9 NYCRR 4120.17), alleging that respondent exceeded its statutory authority and that the regulation is arbitrary and capricious. Supreme Court (Rakower, J.) granted petitioners a preliminary injunction prohibiting respondent from enforcing the regulations and transferred venue. Respondent then answered, seeking dismissal of the petition. Ultimately, Supreme Court (Powers, J.) determined that respondent had exceeded its statutory authority by adopting the regulation, annulled it and permanently enjoined respondent from enforcing it.[2] Although that was sufficient to completely dispose of the matter, “in an effort to guide the parties” in drafting potential future regulations, the court addressed specific provisions of the regulation and found them to be arbitrary and capricious. Respondent appeals.
Supreme Court erred in finding that respondent lacked the statutory authority to adopt regulations permitting out-of-competition drug testing of harness racehorses. Racing, PariMutuel Wagering and Breeding Law § 902 (1) provides that the drug testing of horses “at race meetings shall be conducted by a state college within this state with an approved equine science program.” Supreme Court agreed with petitioners that the plain language of this provision limits respondent’s authority to test racehorses for drugs to only those horses that are competing “at race meetings” and does not extend to horses stabled offtrack or to times outside active competition. However, as respondent argues, that section of the statute does not define or otherwise limit respondent’s authority to implement regulations to conduct drug testing but, rather, mandates that any testing ordered by respondent on track, at race meetings, be conducted by an approved entity (see Racing, Pari-Mutuel Wagering and Breeding Law § 902 [1]). Moreover, the court’s analysis overlooks the plain language of Racing, Pari-Mutuel Wagering and Breeding Law former §§ 101 and 301. The first of those statutes provides respondent with “general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein” (Racing, Pari-Mutuel Wagering and Breeding Law former § 101 [1] [emphasis *1073 added]).[3] The latter statute directs respondent to “adopt rules and regulations ... to carry into effect [the statutes’] purposes and provisions and to prevent circumvention or evasion thereof” (Racing, Pari-Mutuel Wagering and Breeding Law § 301 [1]), and, most notably, directs respondent to “prescribe rules and regulations for effectually preventing the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed of harness horses in races in which they are about to participate” (Racing, Pari-Mutuel Wagering and Breeding Law § 301 [2] [a]).
Contrary to petitioners’ contentions, nothing in the Racing, Pari-Mutuel Wagering and Breeding Law specifically limits respondent’s ability to administer drug tests to horses that are either physically located at a state racetrack or immediately scheduled to compete in a race. While Racing, Pari-Mutuel Wagering and Breeding Law § 902 mandates that any on-track, in-competition drug testing be conducted by a specific entity “to assure the public’s confidence and continue the high degree of integrity in racing,” it does not prohibit respondent from developing a separate off-track, out-of-competition drug testing program. On the contrary, Racing, Pari-Mutuel Wagering and Breeding Law former § 101 (1) expressly authorizes respondent to regulate off-track, out-of-competition activity. Considering the plain language of Racing, Pari-Mutuel Wagering and Breeding Law former § 101, as well as respondent’s “very broad power to regulate the harness racing industry” (Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269, 277 [1972]), and “the State’s interest in assuring the integrity of racing carried on under its auspices” (Equine Practitioners Assn. v New York State Racing & Wagering Bd., 105 AD2d 215, 219 [1984], mod on other grounds 66 NY2d 786 [1985]), respondent did not exceed its statutory authority when it adopted regulations permitting off-track, out-of-competition drug testing.
Having determined that respondent had the authority to adopt the regulation, we now look to its substance. This Court should uphold a regulation if it has a rational basis and is not unreasonable, arbitrary or capricious (see Kuppersmith v Dowling, 93 NY2d 90, 96 [1999]; Matter of Sullivan Fin. Group, Inc. v Wrynn, 94 AD3d 90, 94 [2012]; Matter of Quagliata v *1074 Starbucks Coffee, 82 AD3d 1321, 1322 [2011], lv denied 17 NY3d 703 [2011]). Here, the objective of the out-of-competition drug testing regulation, as stated by respondent when it was proposed, is “[t]o enable [respondent] to assure the public’s confidence and preserve the integrity of racing at pari-mutuel betting tracks by regulating the use of drugs and medications in race horses so that their natural racing ability is not compromised or enhanced by such use.” Prior to the adoption of the regulation at issue, respondent was permitted to conduct pre- and postrace on-track drug testing, but there was no provision permitting respondent “to detect and deter the administration of prohibited performance-enhancing drugs and substances in race horses that are not stabled on the grounds of a racetrack.” According to George Maylin, the director of respondent’s drug testing and research program, the existing drug testing scheme was insufficient to detect when an unscrupulous owner or trainer had “doped” a horse in order to enhance its performance because new doping agents exist that can be administered to a horse off-track many weeks in advance of a race and then clear out of the horse’s system so that they are not detectable in a blood sample taken on the day of the race. Maylin averred that the only reliable way to detect whether a horse had been given these new performance-enhancing agents is to test the horse off-track, well in advance of a race.
The 180-day testing window was not wholly arbitrary or capricious. As Maylin explained, the prohibited doping agents can remain “efficacious for many weeks or longer” and “affect performance long after the drug can be detected.” Accordingly, respondent identified a 180-day window prior to competition in which horses may be tested (see 9 NYCRR 4120.17 [b]). Although petitioners complain that the time frame is wholly arbitrary, such time frame allows owners and trainers to identify horses that may be excused from sampling — i.e., horses that are not anticipated to race within 180 days — and also serves to deter unscrupulous trainers and owners from asserting that certain horses should be excluded from testing based on false claims that they do not intend to race within the next 180 days. While petitioners contend that newer scientific testing methods provide more accurate test results closer in time to a race, respondent is not required to adopt the newest or least restrictive alternatives, especially taking into consideration such legitimate concerns as respondent’s current technological capabilities and *1075 budgetary constraints.[4] Considering that some other jurisdictions have longer windows or no time limitation for out-of-competition testing (see e.g. 71 Ind Administrative Code 8-3-5 [b] [365 days]; NJ Administrative Code § 13:70-14A.13 [b] [any horse that has competed or is intended to compete within a calendar year]; 810 Ky Administrative Regs 1:110 [3] [1] [any horse eligible to race in the state, with no time frame listed]; see also Assoc. of Racing Commrs. Intl. model rule 011-022), a 180-day window is not irrational and is reasonably related to respondent’s stated purpose in adopting the regulations (see Equine Practitioners Assn. v New York State Racing & Wagering Bd., 105 AD2d at 220).
Respondent contends that Supreme Court further erred by declaring arbitrary the regulation’s requirement that a licensed owner or trainer, upon respondent’s request, bring to a New York track any racehorse that is stabled out-of-state within 100 miles of the track (see 9 NYCRR 4120.17 [c]).[5] According to the regulatory impact statement, before setting a maximum radius to require an owner or trainer to transport a horse, respondent “considered the cost and impracticality of shipping a horse for testing great distances (e.g. across the country)” and based the 100-mile radius “in part on the fact that many horsemen ship approximately that distance in order to compete at New York tracks.” Thus, contrary to petitioners’ contention and the court’s finding, the distance is not completely arbitrary or without rationale and, considering that many other jurisdictions that perform out-of-competition testing have no maximum distance provision (see e.g. 11 III Administrative Code § 603.200 [a] ; 71 Ind Administrative Code 8-3-5 [a], [e]; 810 Ky Administrative Regs 1:110 [3] [1]; NJ Administrative Code § 13:70-14A.13 [b] ; NM Administrative Code § 15.2.6.9; see also Assoc. of Racing Commrs. Intl. model rule 011-022), a 100-mile radius is rational and reasonable.
Supreme Court erred in finding that the regulation impermissibly infringed on the legal rights of individuals not licensed by *1076 respondent.[6] Horse farm owners who lease property on which racehorses are kept have a reduced expectation of privacy due to the fact that horse racing is a highly regulated industry (see Marshall v Barlow’s, Inc., 436 US 307, 313 [1978]; Anobile v Pelligrino, 303 F3d 107, 117-121 [2002]). Moreover, the limited intrusion onto such property is not unconstitutional considering that respondent has a substantial interest in detecting performance-enhancing drugs in racehorses, it is necessary for respondent to enter private property for the limited purpose of conducting the test and the regulation provides adequate notice to private horse farm owners that such testing may occur if they house horses under the care or control of licensed racehorse owners and trainers (see Donovan v Dewey, 452 US 594, 600 [1981]; Anobile v Pelligrino, 303 F3d at 117-118). Additionally, all applicants for licenses — which would include owners and trainers — are deemed to consent to providing respondent access to any off-track premises where their horses are stabled, and are required to “take any steps necessary to authorize access by [respondent’s] representatives to such off-track premises” (9 NYCRR 4120.17 [j]). Thus, trainers and owners stabling horses at private farms have an obligation to obtain permission from the property owners for possible unannounced visits by respondent’s representatives, thereby placing the burden on licensed individuals rather than individuals who are not licensed.
The regulation only requires any “trainer, owner and/or their designees and any licensed racing corporation” to cooperate with respondent regarding testing (9 NYCRR 4120.17 [g]). While that provision permits respondent to impose fines and penalties on “any licensee or other person” who fails or refuses to cooperate, the only nonlicensed persons who are required to cooperate are designees of trainers and owners, or representatives of licensed racing corporations (9 NYCRR 4120.17 [g]). The language does not explicitly apply to farm owners. Even if the provision imposing fines and penalties on nonlicensed individuals for their failure to cooperate with respondent could be read to apply to nonlicensed farm owners, Racing, Pari-Mutuel Wagering and Breeding Law § 310 expressly authorizes respondent to impose fines or penalties on anyone “participating in any way” in harness racing. It is reasonable to conclude that leasing property to licensed owners and trainers of racehorses constitutes participation “in any way” for purposes of that statute. *1077 Thus, the regulation does not improperly infringe on the legal rights of nonlicensed farm owners.
Supreme Court erred in striking down the regulation’s penalty against a trainer for a positive drug test. Although the regulation provides for a minimum penalty of a 10-year suspension, the trainer can receive a lower penalty by demonstrating “extraordinary mitigating circumstances” (9 NYCRR 4120.17 [i]). A 10-year suspension, while lengthy, is not so disproportionate to the offense as to shock the conscience; respondent purposely included a lengthy suspension to deter serious violations that could compromise the integrity of horse racing as well as endanger both human and equine competitors. As respondent noted when adopting the regulation, the penalty is consistent with that of at least two other states (see 71 Ind Administrative Code 8-3-5 [i]; NJ Administrative Code § 13:70-14A.13 [e]). Hence, the penalty provision is not arbitrary, capricious or unreasonable.
Supreme Court found that the list of prohibited substances was both vague and inconsistent with other regulations permitting the use of certain substances. The regulation at issue defines “[p]rohibited substances” as “(1) blood doping agents including” specifically listed substances, “or any substance that abnormally enhances the oxygenation of body tissues; (2) gene doping agents or the nontherapeutic use of genes, genetic elements, and/or cells that have the capacity to enhance athletic performance or produce analgesia; (3) protein and peptide-based drugs, including toxins and venoms” (9 NYCRR 4120.17 [e]). While experts may debate the application of some phrases contained in the regulation, such as whether a substance “abnormally enhances the oxygenation of body tissues” or whether the use of certain genes or cells is “nontherapeutic” or has “the capacity to enhance athletic performance or produce analgesia,” the list of prohibited substances is not so vague as to require annulment of the regulation.
Subparagraph (e) (3) of 9 NYCRR 4120.17, however, is inconsistent with a different regulation that permits the use of specified substances during certain time frames prior to races (see 9 NYCRR 4120.2). Maylin acknowledged that certain drugs with permitted uses under 9 NYCRR 4120.2 contain proteins, which would render them prohibited under 9 NYCRR 4120.17 (e) (3). He avers that respondent would read the specific rule as governing over the more general rule — i.e., that respondent would allow horses to be treated with protein-based drugs that are permitted within certain time frames under 9 NYCRR 4120.2 despite the unconditional ban of protein and peptide-based *1078 drugs under 9 NYCRR 4120.17 (e) (3) — but this assertion is not supported by any language in either regulation. A rule of statutory construction provides that a general provision yields to a specific one, but only when “there is a general and a particular provision in the same statute” (McKinney’s Cons Law of NY, Book 1, Statutes § 238; see Matter of Lamar Adv. of Penn, LLC v Pitman, 9 AD3d 734, 735 [2004]). Even assuming that this rule can be applied to regulations, as opposed to statutes, the general and specific provisions at issue here exist in different regulations, rendering the rule inapplicable. Accordingly, we find that the portion of the regulation prohibiting all “protein and peptide-based drugs” was properly annulled because it is inconsistent with, and cannot be reconciled with, the permitted-use regulation.
Rose, J.P., Spain and Egan Jr., JJ., concur. Ordered that the judgment is modified, on the law, without costs, by reversing so much thereof as annulled and enjoined respondent from enforcing all portions of 9 NYCRR 4120.17 except (e) (3) and, as so modified, affirmed.

. Effective February 1, 2013, the Racing, Pari-Mutuel Wagering and Breeding Law was amended (see L 2012, ch 60, § 1 [part A]), and respondent was merged into a newly-created entity called the New York State Gaming Commission (see Racing, Pari-Mutuel Wagering and Breeding Law § 102).

. Inasmuch as petitioners challenged only the regulation applicable to harness racehorses, the regulation applicable to thoroughbred racehorses (see 9 NYCRR 4043.12) remains valid.

. While petitioners argue that the phrase “both on-track and off-track” is meant to modify only the immediately prior words “betting activities,” we read that explanatory phrase more broadly, as applying to “all horse racing activities and all pari-mutuel betting activities” (Racing, Pari-Mutuel Wagering and Breeding Law former § 101 [1]). This broader reading more fully allows respondent to fulfill its purpose and obligations.

. Petitioners point to the tests performed by respondent in another case (Matter of Laterza v New York State Racing & Wagering Bd., 68 AD3d 1509, 1510-1511 [2009]), as proof that such newer testing methods could be implemented. While scientifically possible, this is not required. Indeed, the experts in that case noted that respondent did not own the equipment necessary to conduct a confirmatory test, and such equipment was “very expensive and rare” (id. at 1511).

. For horses stabled in New York, respondent’s employees will apparently travel to the stable to take a specimen for testing.

. Inasmuch as respondent did not raise petitioners’ lack of standing with respect to this issue in its answer, that defense has been waived (see CPLR 3211 [a] [3]; [e]).