| |
|---|
| **Zic v City of New York** |
| 2024 NY Slip Op 30028(U) |
| January 2, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 159201/2012 |
| Judge: Francis A. Kahn III |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:    <u>HON. FRANCIS A. KAHN, III</u>       PART          **32**

*Justice*

-------------------------------------------------------------------X

VELIMIR ZIC and MARILYN ZIC,

           Plaintiffs,

-against-

THE CITY OF NEW YORK, THE METROPOLITAN
TRANSPORTATION AUTHORITY, THE NEW YORK CITY
TRANSIT AUTHORITY, TISHMAN CONSTRUCTION
CORPORATION, AECOM TECHNOLOGY CORPORATION,
CITNALTA CONSTRUCTION CORP., JUDLAU
CONTRACTING, INC.,THE NEW YORK TIMES COMPANY,
FOREST CITY RATNER COMPANIES, FOREST CITY
ENTERPRISES, AMEC CONSTRUCTION MANAGEMENT,
INC., BOSTON PROPERTIES LIMITED PARTNERSHIP,
QUEENS BALLPARK COMPANY, LLC, HUNT
CONSTRUCTION GROUP, LEND LEASE CORPORATION
LIMITED f/k/a BOVIS LEND LEASE LMB, INC., and TOTAL
SAFETY CONSULTING,

           Defendants.

-------------------------------------------------------------------X

CITNALTA CONSTRUCTION CORP., METROPOLITAN
TRANSPORTATION AUTHORITY, NEW YORK CITY
AUTHORITY, and JUDLAU CONTRACTING, INC.,

           Third-Party Plaintiffs,

-against-

L&L PAINTING CO., INC.,

           Third-Party Defendant.

-------------------------------------------------------------------X

TISHMAN CONSTRUCTION CORPORATION, AECOM
TECHNOLOGY CORPORATION, and LEND LEASE
CORPORATION LIMITED f/k/a BOVIS LEND LEASE LMB,
INC.,

           Second Third-Party Plaintiffs,

-against-

THE CITY OF NEW YORK, THE METROPOLITAN

INDEX NO.      159201/2012

MOTION DATE      N/A, N/A,
N/A, N/A,
N/A, N/A

MOTION SEQ. NO.      011 012 013
014 015 016

## DECISION + ORDER ON MOTION

Third-Party
Index No. 590041/2014

Second Third-Party
Index No. 595292/2014

159201/2012   ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 1 of 31

TRANSPORTATION AUTHORITY, THE NEW YORK CITY
TRANSIT AUTHORITY, and L&L PAINTING CO., INC.,

                      Second Third-Party Defendants.
-------------------------------------------------------------------------------X

QUEENS BALLPARK COMPANY, LLC,

                           Third Third-Party Plaintiff,

                  -against-

L&L PAINTING CO., INC.,

                           Third Third-Party Defendant.
-------------------------------------------------------------------------------X

                                 Third Third-Party
                                 Index No. 595633/2014

The following e-filed documents, listed by NYSCEF document number (Motion 011) 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 589, 590, 591, 592, 593, 594, 595, 596, 597, 598, 599, 600, 601, 602, 603, 691, 692, 693, 694, 695, 696, 698, 713, 714, 717, 718, 724, 725, 726, 727, 728, 733

were read on this motion for                         SUMMARY JUDGMENT

The following e-filed documents, listed by NYSCEF document number (Motion 012) 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 586, 661, 662, 663, 664, 665, 666, 667, 668, 669, 670, 671, 672, 673, 674, 675, 686, 699, 706, 707, 719, 734, 739

were read on this motion for                         SUMMARY JUDGMENT

The following e-filed documents, listed by NYSCEF document number (Motion 013) 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 587, 630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 643, 644, 645, 646, 647, 648, 649, 650, 651, 652, 653, 687, 700, 708, 720, 730, 735

were read on this motion for                         SUMMARY JUDGMENT

The following e-filed documents, listed by NYSCEF document number (Motion 014) 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 588, 654, 655, 656, 657, 658, 659, 660, 688, 689, 690, 701, 704, 721, 731, 732

were read on this motion for                         SUMMARY JUDGMENT

The following e-filed documents, listed by NYSCEF document number (Motion 015) 557, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 628, 629, 702, 709, 710, 711, 712, 722, 729, 736

were read on this motion for                         SUMMARY JUDGMENT

The following e-filed documents, listed by NYSCEF document number (Motion 016) 576, 577, 578, 579, 580, 581, 582, 583, 676, 677, 678, 679, 680, 681, 682, 683, 684, 685, 703, 715, 716, 723, 737, 738

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

**Page 2 of 31**

[* 2]

were read on this motion for         SUMMARY JUDGMENT

Motion sequence numbers 011, 012, 013, 014, 015, and 016 are consolidated for disposition.

In this action for personal injuries, plaintiff Velimir Zic (plaintiff) alleges that he suffered lung cancer and lead poisoning and related illnesses as a result of his work as a painter and lead abatement worker for third-party defendant/second third-party defendant/third third-party defendant L&L Painting Co., Inc. (L&L).

Defendant Hunt Construction Group (Hunt) moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint and all cross-claims and counterclaims against it (motion sequence number 011).

Defendant/third third-party plaintiff Queens Ballpark Company, L.L.C. (QBC) moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint and all cross-claims and counterclaims against it in their entirety. Alternatively, QBC moves for summary judgment on its third third-party claims for contractual indemnification and common-law indemnification against L&L (motion sequence number 012).

Defendants/second third-party plaintiffs Tishman Construction Corporation (Tishman), AECOM Technology Corporation (AECOM), and Lend Lease Corporation f/k/a Bovis Lend Lease LMB, Inc. (Bovis) (collectively, Tishman/Bovis) move, pursuant to CPLR 3212, for: (1) summary judgment dismissing the complaint, cross-claims, and counterclaims against them; (2) summary judgment on Tishman's claim for contractual indemnification against L&L; and (3) summary judgment on Bovis's claim for contractual indemnification against L&L (motion sequence number 013).

**159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No.  011 012 013 014 015 016**

**Page 3 of 31**

3 of 31

Defendants/third-party plaintiffs Citnalta Construction Corp. (Citnalta) and Judlau Contracting, Inc. (Judlau) move, pursuant to CPLR 3212, for summary judgment dismissing plaintiffs' Labor Law § 241 (6), Labor Law § 200, and common-law negligence claims. Alternatively, Citnalta and Judlau move for summary judgment on their contractual indemnification and failure to procure insurance claims against L&L (motion sequence number 014).

Defendants The New York Times Company (New York Times), Forest City Ratner Companies, Forest City Enterprises (together, Forest City), and AMEC Construction Management, Inc. (AMEC) (the New York Times defendants) move, pursuant to CPLR 3212, for summary judgment dismissing the complaint and all cross-claims against them (motion sequence number 015).

Defendant Boston Properties Limited Partnership (hereinafter, Boston Properties) moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint and any cross-claims against it (motion sequence number 016).

## BACKGROUND

*The Parties*

Plaintiff alleges that, from June 11, 2001 through approximately April 18, 2011, he was exposed to lead fumes, lead smoke, lead dust, and painting materials on the following construction projects: Harlem River Drive; the Battery Maritime Building; the Queensboro Bridge; the New York Times Building; the Bronx Park East Station; the United States Post Office at 90 Church Street; Citi Field; the Brooklyn Navy Yard; the New York City Subway West End Line; and the Thurgood Marshall Courthouse (NY St Cts Elec Filing [NYSCEF] Doc No. 378).

**159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No.  011 012 013 014 015 016**

**Page 4 of 31**

4 of 31

[* 4]

On August 21, 2006, QBC hired Hunt/Bovis, joint venture, as a contractor on the Citi Field project (NYSCEF Doc No. 416). On October 23, 2007, Hunt/Bovis entered into a subcontract with L&L for the painting and wall covering for the project (NYSCEF Doc No. 417).

The City of New York (the City) retained Tishman as a construction manager on the Battery Maritime project (NYSCEF Doc No. 514, Szemborski tr at 32-33, 87). By agreement dated March 31, 2004, Tishman retained L&L to perform painting and lead abatement work at the Battery Maritime Building (NYSCEF Doc No. 521).

L&L was hired in connection with a project to upgrade the infrastructure at the Thurgood Marshall Courthouse (NYSCEF Doc No. 510).

On October 5, 2009, Citnalta Construction Corp./Judlau Contracting, Inc., a joint venture, retained L&L to "perform all painting and associated lead abatement for the seven stations and line structures . . . including lead removal and painting of steel repairs, column bases, painting of walls, columns, ceilings, floors, conduit, standpipe, manual wet scraping, establishing a wash station and painting containment areas, legally disposing of all lead materials" (the 7 Stations project) (NYSCEF Doc No. 546 at 2).

AMEC was the general contractor on a project located at the New York Times Building (NYSCEF Doc No. 564, Muldoon tr at 24-25). L&L was retained to paint intumescent coating on the exterior steel of the building (NYSCEF Doc No. 567, Ivankov tr at 95-96, 302-303). Forest City acted as the development manager on behalf of the ownership interest (NYSCEF Doc No. 565, Cooperman tr at 22, 29). Nonparty The New York Times Building, LLC owned the building (NYSCEF Doc No. 566, Brayton tr at 25; NYSCEF Doc No. 565, Cooperman tr at 22-24, 30-33). The New York Times is a distinct entity (NYSCEF Doc No. 566, Brayton tr at 24).

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 5 of 31

[* 5]

L&L was hired for a project located at the United States Post Office located at 90 Church Street (NYSCEF Doc No. 512, plaintiff tr at 846). Boston Properties was the United States Postal Office's development manager (NYSCEF Doc No. 580, Schubert tr at 19-23, 26).

*Plaintiff's Deposition Testimony*

Plaintiff testified that, from 1989 through 1993, he worked as a painter and lead abatement worker for Belt Painting (*id.* at 17, 60, 256). Plaintiff began working for L&L as a painter and lead abatement worker in 1993 (*id.* at 31).

He testified that he worked at Citi Field but could not remember the dates that he worked there (*id.* at 66). He served as a foreman unless another foreman was sent to the job (*id.* at 100). L&L provided protective equipment, including respirators (*id.* at 84, 173). Plaintiff used a half face respirator at Citi Field (*id.* at 879). Plaintiff could not recall how often he changed the filters for his respirator (*id.* at 880). He did not do any fit test; he explained "[t]hat wasn't up to [him]" (*id.*). Plaintiff's respirator was fit tested only once per year, and plaintiff did not undergo a fit test while working at Citi Field (*id.* at 200, 880). Plaintiff admitted that he removed his respirator when "he needed to communicate with the men" because it was "the only way to communicate with them" (*id.* at 81, 882). He testified that the amount of time that he had his mask off varied depending on what needed to be done (*id.* at 81). At other times, plaintiff removed his mask when he was mixing the paint if he needed to talk to the painters (*id.* at 88). Plaintiff mixed paint every day, for 15 to 45 minutes each time (*id.* at 89). He testified that the painting work at Citi Field was exclusively performed outside; "[e]verything was open air" (*id.* at 613, 617). Plaintiff did not recall any specifics about the paint used at Citi Field, other than the finished product was a two-part epoxy (*id.* at 878). He did not know whether he used Macropoxy at Citi Field, and stated that he may have used Zinc Clad III at Citi Field (*id.* at 1036-

159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 6 of 31

6 of 31

1037). He testified that a product named Acrolon sounded familiar (*id.* at 1037). Plaintiff's primary responsibilities at Citi Field included filling out forms, giving instructions to L&L employees, mixing the paint, and applying the paint using roller brushes (*id.* at 1053). Plaintiff performed most of his painting work on the exterior part of Citi Field (*id.* at 1014). He performed some painting on the interior parts of Citi Field, which were open-air spaces (*id.*). Plaintiff testified that Citi Field was new construction and that he was unaware of any exposure to lead paint at that location (*id.* at 1216). He did not recall being exposed to asbestos while working for L&L (*id.* at 1244). Plaintiff only worked with a brush or a roller at Citi Field, and never spray painted (*id.* at 1276). According to plaintiff, it was common practice to use lead wipes for cleaning purposes (*id.* at 1025).

Plaintiff testified that he worked "on and off" at the Battery Maritime Building between May 10, 2004 and October 24, 2005 (*id.* at 550-551, 558). Plaintiff testified that his work was largely outside, with no closed walls, and consisted of pressure washing and painting the exterior of the building (*id.* at 551, 555, 558). Plaintiff used a respirator and a face shield to perform the pressure washing work (*id.* at 557). He used a respirator, harness, hardhat, and safety glasses to perform the painting work (*id.* at 558). Plaintiff testified that he removed his respirator if he "needed to communicate with somebody" (*id.* at 559). He testified that the area where he was working was "open space" (*id.* at 1124-1125). Plaintiff did not perform lead abatement work at the Battery Maritime Building (*id.* at 1114-1116).

According to plaintiff, he worked at the Thurgood Marshall Courthouse as a foreman and painter from August 9, 2010 through April 13, 2011 (*id.* at 759). He performed chemical lead abatement, scraped loose paint from walls and ceilings, and performed a small amount of painting (*id.* at 763). Plaintiff performed his work in a containment area to contain the lead and

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

**Page 7 of 31**

[* 7]

chemical stripper (*id.* at 117). Plaintiff used a harness, hardhat, safety glasses, respirator, and rubber gloves (*id.* at 764). Plaintiff was required to wear his respirator in the containment area, which he did except to communicate with the workers (*id.* at 117-119, 766-769). Plaintiff complained to his foreman that there were an insufficient number of respirator filters (*id.* at 765).

Plaintiff further testified that, from January 11, 2010 through December 6, 2010, he performed painting and lead abatement work at the 7 Stations project, which entailed abating lead and painting the steel tracks of the subway line (*id.* at 690-691). He testified that all of the lead abatement work was performed outdoors along the exposed steel beams supporting the outdoor subway line (*id.* at 709). Plaintiff was required to surround the area in which he performed lead abatement work, by erecting a containment area which consisted of a plastic tarp (*id.* at 711-712). During the lead abatement work, plaintiff wore a Tyvek suit, safety glasses, a respirator, and gloves (*id.* at 354). Once he completed the lead abatement, plaintiff painted the steel support beams (*id.* at 340, 342-343). Plaintiff testified that he complained to his foreman, Milan Ivankov, that the filters for his respirators were clogged (*id.* at 721-722). Plaintiff further testified that the wash stations did not work (*id.* at 724).

Plaintiff worked at the New York Times Building from December 5, 2005 through January 8, 2007 (*id.* at 576-577). During his work at the New York Times Building, plaintiff performed scaffold rigging, and prepared and painted the firecoating system (*id.* at 577, 805-806). Plaintiff erected scaffolds on the exterior of the building between different floors (*id.* at 577-578). Plaintiff was responsible for rebuilding the bottom floor of the scaffold using wooden planks and for building the containment structure using tarps (*id.* at 578-579, 803-813). Plaintiff wore a half face respirator when he performed scaffold rigging (*id.* at 813-814, 819). To perform the firecoating work, plaintiff mixed two different paint products, applied it onto the steel beam

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 8 of 31

8 of 31

using a paint gun, and smoothed the paint out using a roller (*id.* at 581-583, 817-818). Plaintiff also cleaned the steel with solvents and/or a grinder and applied a primer using a paint brush and a roller (*id.* at 816-817). He testified that his respirator filters became clogged (*id.* at 583-584, 821-822). When his respirator became clogged, he asked for another respirator filter or would perform another task (*id.* at 586, 589-590).

Plaintiff worked at 90 Church Street from August 2007 through April 2008 (*id.* at 606). At 90 Church Street, plaintiff testified that he did painting and scraping work (*id.* at 847). He did not recall whether he used a respirator there (*id.*). Plaintiff, however, recalled using a hardhat, gloves, safety glasses, and a harness (*id.* at 848). He used a hand scraper to remove the paint from surfaces (*id.* at 850). He testified that there was no lead in the paint (*id.*).

## PROCEDURAL HISTORY

Plaintiffs commenced this action on November 7, 2012, seeking recovery for common-law negligence and violations of Labor Law §§ 200 and 241 (6) (NYSCEF Doc No. 378). Plaintiff allegedly had an onset of shortness of breath in January 2011, and was diagnosed with lung cancer on April 13, 2011 (NYSCEF Doc No. 397). Plaintiffs claim that, as a result of plaintiff's work, he has suffered lung cancer, lead poisoning, coronary heart disease, reduced kidney function, hypertension, and exacerbation of his lung cancer and lead poisoning, and depression and mental and emotional distress (NYSCEF Doc Nos. 397-400). Plaintiff's wife, Marilyn Zic, also asserts a derivative claim for loss of consortium (NYSCEF Doc No. 378).

Defendants subsequently impleaded, among other parties, L&L, seeking indemnification, contribution, and damages for failure to procure insurance (NYSCEF Doc Nos. 60, 93, 105).

Previously, the City moved for summary judgment, relying upon an affidavit from Dr. Howard Sandler, M.D. (Dr. Sandler), a physician who specialized in occupational and

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

Page 9 of 31

9 of 31

environmental medicine, on the basis that the City did not cause plaintiff's claimed injuries (NYSCEF Doc No. 418, Sandler aff). Dr. Sandler opined that lung cancer has a minimum latency period of 10 to 20 years (*id.*, ¶ 15). Dr. Sandler concluded, within a reasonable degree of medical certainty, that plaintiff's squamous cell lung cancer could not have been caused by any alleged exposures from 2001 or later, as it does not meet the minimum medically-accepted latency period for squamous cell lung cancer (*id.*, ¶ 16). Dr. Sandler also stated that lead poisoning in adults usually occurs with a blood lead level of over 100 ug/dL for a significant duration (*id.*, ¶ 29). In light of the fact that plaintiff's highest blood lead level was 32 ug/dL on a single occasion on February 18, 2010, Dr. Sandler concluded, within a reasonable degree of medical certainty, that plaintiff did not sustain lead poisoning, and none of plaintiff's injuries can be attributed to lead exposure (*id.*, ¶¶ 29-30).

On February 14, 2020, Justice Arlene P. Bluth granted the City's motion, explaining that:

"Neither plaintiffs nor any other party offered any expert opinions that contradict Dr. Sandler's conclusions. Therefore, the Court has no choice but to grant the City's motion and the cross-motion by the MTA and NYCTA. The fact is that there is uncontroverted expert evidence that plaintiff's cancer began to develop long before plaintiff worked at sites involving the City, the MTA and NYCTA. And there is no evidence to contradict the City's claim that blood tests performed on plaintiff demonstrated that his lead levels were too low to suffer any deleterious effects. Accordingly, a deposition of these parties would be irrelevant because they could not have caused plaintiff's injuries based on Dr. Sandler's well-reasoned affidavit. And all claims and cross-claims against these parties should be dismissed for the same reason"

(*Zic v City of New York*, 2020 NY Slip Op 30420[U], *2 [Sup Ct, NY County 2020]).

## THE PARTIES' CONTENTIONS AS TO CAUSATION

*Hunt and QBC*

Hunt and QBC move for summary judgment, arguing that plaintiff's injuries were not caused by his work at Citi Field.

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 10 of 31

10 of 31

To support their position, Hunt and QBC submit an affidavit from Dr. Carrie A. Redlich, MD, MPH (Dr. Redlich), the director of the Yale Occupational and Environmental Medicine Program, and a professor of medicine, occupational and environmental medicine and pulmonary and critical care at Yale University School of Medicine (NYSCEF Doc No. 424, Redlich aff, ¶ 1). Dr. Redlich reviewed, among other things, plaintiff's medical records, the pleadings, plaintiff's deposition transcripts, the independent medical examination reports, the affidavit from Dr. Sandler, and the Material Safety Data Sheets for products used by plaintiff at Citi Field (*id.*, ¶ 8). Dr. Redlich states that the medically-accepted latency period for the major types of lung cancer, including non-small cell lung cancer, is at least 10 to 15 years, and more typically 20 to 30 years (*id.*, ¶¶ 10, 30). According to Dr. Redlich, the latency period is not met in this case because plaintiff was diagnosed with non-small cell lung cancer in April 2011, less than four years after he first started working at Citi Field in October 2008 (*id.*, ¶¶ 11, 32). Dr. Redlich further states that plaintiff has not identified any chemicals, substances or materials that are known to cause squamous cell lung cancer (*id.*, ¶ 36). Dr. Redlich avers that one of the three paint products that plaintiff remembered using was Acrolon, which contains crystallized silica (*id.*, ¶ 37). Silica is only considered a human carcinogen if it is in respirable form and inhaled into the lungs (*id.*). Dr. Redlich avers that the silica in Acrolon used at Citi Field was not heated or sprayed, and thus would not be in respirable form either before or after mixing or during application (*id.*, ¶¶ 37-38). In addition, Dr. Redlich states that the Material Safety Data Sheets for the two other products that plaintiff used at Citi Field, Zinc Clad III and Corothane I GalvaPac Zinc, do not document any human lung carcinogens (*id.*, ¶ 39).

Dr. Redlich also opines that plaintiff's other medical conditions cannot be attributed to any lead exposure at Citi Field (*id.*, ¶ 43). Citi Field was new construction, and plaintiff was not

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 11 of 31

11 of 31

exposed to lead paint or other lead-containing products (*id.*). Plaintiff's blood lead levels while he worked at Citi Field fluctuated between 6 and 9 ug/dL, which were below the level that the Center for Disease Control (CDC) defined as elevated at the time (10 ug/dL), and well below the Occupational Safety and Health Administration (OSHA) level for required lead monitoring (greater than 40 to 60 ug/dL) (*id.*, ¶¶ 43-46).

*Tishman/Bovis*

Tishman/Bovis also move for summary judgment on the ground that plaintiff's injuries were not caused by his work at the Tishman/Bovis sites.

As support, Tishman/Bovis submit an additional affidavit from Dr. Redlich, in which she again states that she reviewed plaintiff's deposition transcripts, the pleadings, and bills of particulars, and that the medically-accepted latency period for the major types of lung cancer, including non-small cell lung cancer, is at least 10 to 15 years, and more typically 20 to 30 years (NYSCEF Doc No. 528, Redlich aff, ¶¶ 8, 13). Even employing the conservative range, the latency period is not met because plaintiff was diagnosed with non-small cell lung cancer in April 2011, less than 10 years after he started working at Battery Maritime in May 2004, Citi Field in October 2007, and Thurgood Marshall in 2010 (*id.*, ¶ 15). Dr. Redlich further notes that plaintiff was likely exposed to asbestos and diesel exhaust fumes while employed by Belt Painting, during which time he painted in the New York City subway system (*id.*, ¶ 17). Dr. Redlich, therefore, concludes, with a reasonable degree of medical certainty, that plaintiff's work at Tishman/Bovis sites did not cause or contribute to the development of his lung cancer (*id.*, ¶ 18). Moreover, Dr. Redlich also opines that lung cancer is not a condition that becomes exacerbated, unlike asthma or COPD (*id.*, ¶ 19).

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

**Page 12 of 31**

12 of 31

Furthermore, with respect to plaintiff's claim of lead poisoning and related maladies, plaintiff's blood lead levels were within acceptable levels while working at Battery Maritime, Citi Field and Thurgood Marshall (*id.*, ¶¶ 20-21). Dr. Redlich explains that lead toxicity in adults usually occurs with a blood lead level of at least 40 ug/dL for a significant period of time (*id.*, ¶ 20). According to Dr. Redlich, plaintiff's only blood lead level measured during his work at Battery Maritime was 9 ug/dL; the highest blood lead level was 9 ug/dL; and the highest blood lead level at Thurgood Marshall was 29 ug/dL (*id.*, ¶¶ 22-23). Plaintiff's blood lead levels did not exceed the 40 ug/100g indicated by OSHA as requiring regular testing or the 60 ug/100g level, which would require his removal from the site (*id.*, ¶ 24). Thus, Dr. Redlich concludes, with a reasonable degree of medical certainty, that plaintiff's work at Citi Field, Battery Maritime, and Thurgood Marshall did not contribute to any of the conditions he attributed to lead fumes and dust, including lead poisoning, coronary heart disease, hypertension, cognitive impairments, reduced kidney function, or an alleged exacerbation of his lung cancer (*id.*, ¶ 25).

*Citnalta and Judlau*

Citnalta and Judlau also move for summary judgment on the issue of causation, arguing that plaintiff's injuries were not caused by his work on the 7 Stations project.

Citnalta and Judlau offer an additional affidavit from Dr. Sandler, who indicates that he is a licensed physician specializing in occupational and environmental medicine (NYSCEF Doc No. 534, Sandler aff, ¶ 1). Dr. Sandler reviewed the pleadings, plaintiffs' bills of particulars, discovery responses, plaintiff's medical records and workers' compensation records, employment records, and plaintiff's deposition testimony (*id.*, ¶ 14). According to Dr. Sandler, "[a] latency period is defined in medicine as the period of time between when an individual is first exposed to a toxin including a carcinogen and the development of a clinically detectable

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 13 of 31

13 of 31

disease entity, specifically lung cancer" (*id.*, ¶ 20). "Latency/temporality is a 'must' in proper causal association determination" (*id.*, ¶ 19 [a]). Dr. Sandler reiterates that lung cancer has a minimum latency period of 15 to 20 years, depending on the carcinogen involved, the extent of exposure, and other likely factors (*id.*, ¶ 20). Dr. Sandler again opines that plaintiff's squamous cell lung cancer could not have been caused by any exposures from 2001 or later (*id.*, ¶ 21). With respect to the 7 Stations project, there was, at most, a one year and one month latency period, which is insufficient to establish a causal association (*id.*, ¶ 22). Plaintiff's medical records documents other risk factors, including his diagnosis with human papilloma virus, cigarette smoking, COPD and restrictive lung disease, and alcohol consumption (*id.*, ¶¶ 23-26). Dr. Sandler states that plaintiff's highest blood lead level while he worked at the 7 Stations project was 32 ug/dL, measured on a single occasion, February 18, 2010 (*id.*, ¶¶ 34-35). Dr. Sandler attests that lead poisoning in adults occurs with a blood lead level of well over 50 to 75 ug/dL and frequently 100 ug/dL for a significantly long duration, i.e., many years (*id.*, ¶ 35). In addition, Dr. Sandler states that there are no known links between exposure to lead, benzene, paint, paint solvents, paint thinners, chemical strippers and coronary heart disease, hypertension, and reduced kidney function within the latency period (*id.*, ¶¶ 37-40). Therefore, Dr. Sandler concludes, within a reasonable degree of medical certainty, that Citnalta and Judlau did not proximately cause plaintiff's injuries (*id.*, ¶ 43).

*New York Times Defendants*

The New York Times defendants argue that plaintiff's work at the New York Times Building did not cause his injuries.

They offer an affidavit from Julie Panko, CIH (Panko), a certified industrial hygienist, who reviewed, among other things, the complaint, plaintiff's bills of particulars, deposition

**159201/2012   ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No.   011 012 013 014 015 016**

Page 14 of 31

testimony, medical records, and the AMEC Health and Safety Plans (NYSCEF Doc No. 572, Panko aff, ¶ 10). Panko concludes, to a reasonable degree of scientific certainty, that plaintiff was not exposed to any lung carcinogens during his work at the New York Times Building, and, therefore, plaintiff's work is unlikely to be related to his diagnosis of lung cancer (*id.*, ¶ 28). More specifically, Panko states plaintiff was not exposed to any lung carcinogens while rigging the scaffold, creating a containment area around the scaffold, grinding the surface with a grinder, cleaning the surface, applying the primer, applying the fireproof coating, and painting the surface (*id.*, ¶¶ 16-22). In particular, Panko reviewed the safety datasheets for the recommended primers set forth in the technical datasheet for Chartek 8, and states that neither of the recommended primers contained substances that have been classified as lung carcinogens (*id.*, ¶ 20). In addition, the fireproof coating material used on the project, Chartek 8 E, is categorized as an epoxy intumescent and the substances listed as constituents are not classified as lung carcinogens (*id.*, ¶ 21).

*Boston Properties*

Boston Properties also moves for summary judgment on the issues of general and specific causation.

Boston Properties relies on Dr. Sandler's and Dr. Redlich's opinions concerning the latency period for lung cancer. Boston Properties argues that plaintiff worked at 90 Church Street only four years before he was diagnosed with lung cancer, which is insufficient. Moreover, Boston Properties contends that plaintiff's work at 90 Church Street did not involve the removal or abatement of lead, and the only blood lead level test taken during his work there revealed a blood lead level of 5 ug/dL on March 8, 2008 (NYSCEF Doc No. 512, plaintiff tr at 847; NYSCEF Doc No. 582 at 8).

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

Page 15 of 31

15 of 31

[* 15]

*Plaintiffs*

In opposition to the motions, plaintiffs contend that they have established both general and specific causation. Plaintiffs assert that Dr. Redlich incorrectly concluded that the minimum latency period for lung cancers is ten years or more. As support, plaintiffs offer an affidavit from Dr. Richard Troast, Ph.D. (Dr. Troast), a toxicologist formerly employed by the United States Environmental Protection Agency for 32 years (NYSCEF Doc No. 590, Troast aff, ¶¶ 1-6). Plaintiffs state, based upon a meta-analysis of lung cancer in painters (NYSCEF Doc No. 591, Guha N, Merletti, F, Steenland, NK, et al., *Lung Cancer Risk in Painters: A Meta-Analysis*, 118 Envtl. Health Perspectives 3 [2010]), that there are multiple references to lung cancer latency periods in painters of less than 10 years. In addition, Dr. Troast states that there is a risk of lung cancer in painters for less than 10 years of exposure and that that risk increases significantly after 10 years of exposure (*id.*, ¶¶ 31, 42). Dr. Troast also maintains that "[t]he identification of the cancer of the lung in 2011 as 3.6 x 2.5 x 2.0 cm for Mr. Zic was likely not the initial stage of the tumor," and that continuing exposures to painting fumes and lead from painting and the abatement of old paint exacerbated the severity of the cancer and the severity of the chronic, toxic effects from lead poisoning (*id.*, ¶ 43). Dr. Troast avers that "[t]he data confirms that from Dec. 1999 through April 2011 Mr. Zic had an elevated blood lead level as defined by the CDC as > 5 ug/dL which is the national threshold of concern for both children and adults" (*id.*, ¶ 20). During that period, there were 22 instances of elevated blood lead levels reported that exceeded 5 ug/dL (*id.*, ¶ 22). Dr. Troast also indicates that "[c]hronic medical effects such as coronary heart disease, hypertension, and renal disease have a strong link to lead exposures" and that "[t]o the extent that Mr. Zic was diagnosed with these serious medical conditions it is more likely that they, too are related to the lead exposures previously described" (*id.*, ¶ 44).

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 16 of 31

16 of 31

Plaintiffs also rely on an independent medical examination report from a pulmonologist, Dr. Carl B. Friedman (Dr. Friedman), to the New York State Insurance Fund dated April 14, 2012, in which he states, among other things, that "[plaintiff], a painter for over 17 years, had been exposed to multiple types of hydrocarbons associated with the painting industry" and "the multiple carcinogens that [plaintiff] was exposed to are on a work-related basis. In this case exposure included toluene, xylene and silica., Group 1 carcinogens" (NYSCEF Doc No. 602, Friedman report, ¶ 12).

Plaintiffs further contend that the Material Safety Data Sheets for three products that plaintiff used at Citi Field – Zinc Clad III, Macropoxy 646, and Acrolon 218 – indicate that these products are "[s]uspected of causing cancer" and that the "[r]isk of cancer depends on duration and levels of exposure" (NYSCEF Doc Nos. 598, 599, 600). With respect to plaintiff's work at the New York Times Building, plaintiffs submit the Material Safety Data Sheet for Chartek 7 Part B, which is "suspected of causing cancer" (NYSCEF Doc No. 608). Plaintiffs also rely on a report from the Environmental & Occupational Health Sciences Institute dated December 15, 2011, which concludes that quartz and crystalline silica are carcinogenic (NYSCEF Doc No. 611). Additionally, plaintiffs assert that plaintiff was exposed to AD Firefilm fireproofing material and Interthane 990HS Top Coat paint on the New York Times Building project, which contain titanium dioxide, and are potential lung carcinogens (NYSCEF Doc Nos. 614, 615).

## DISCUSSION

"On a motion for summary judgment, the moving party must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Trustees of Columbia Univ. in the City of N.Y. v D'Agostino Supermarkets, Inc.*, 36 NY3d 69, 73-74 [2020] [internal quotation marks and citation

**159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No.  011 012 013 014 015 016**

Page 17 of 31

omitted]; *see also* CPLR 3212 [b]). "Failure to make such showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). "Once this showing has been made, the burden shifts to the nonmoving party to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact that require a trial for resolution" (*Giuffrida v Citibank Corp.*, 100 NY2d 72, 81 [2003]). "[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient" to defeat summary judgment (*Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

**Plaintiffs' Failure to Comply with the Court Rules**

As a preliminary matter, defendants argue that their motions for summary judgment should be granted because plaintiffs failed to submit a response to their statement of material facts (*see* 22 NYCRR 202.8-g). The current version of the rule, which became effective prior to the submission of the motions, does not require that the court grant the motions in the event of noncompliance with the rule (*id.*). The court's part rules do not require the submission of statements or counter statements of material facts. In any event, plaintiffs submitted responses to defendants' statements of material facts prior to the submission of the motions.

Moreover, even though plaintiffs did not submit a certification of the word count of their opposition papers (*see* 22 NYCRR 202.8-b [c]), and their papers appear to exceed the permitted word count, the court finds that this is a technical defect that may be overlooked (*see* CPLR 2001; *315 W. 55th Owners Corp. v Rainbow Spa 23 Inc.*, 81 Misc 3d 1204[A], 2023 NY Slip Op 51225[U], *4 [Sup Ct, NY County 2023]; *Sklar v Itria Ventures, LLC*, 2022 NY Slip Op 31800[U], *4 [Sup Ct, NY County 2022]).

**Plaintiff's Claims**

159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 18 of 31

18 of 31

[* 18]

Labor Law § 241 (6) requires owners, contractors, and their agents to "provide reasonable and adequate protection and safety" for workers performing the inherently dangerous activities of construction, excavation and demolition work. To recover under Labor Law § 241 (6), a plaintiff must plead and prove the violation of a concrete provision of the New York State Industrial Code "'that sets forth a specific standard of conduct and [is] not simply a recitation of common-law safety principles'" (*Toussaint v Port Auth. of N.Y. & N.J.*, 38 NY3d 89, 94 [2022], quoting *St. Louis v Town of N. Elba,* 16 NY3d 411, 414 [2011]).

Labor Law § 200 (1) is a "a codification of the common-law duty imposed upon an owner or general contractor to provide construction site workers with a safe place to work" (*Comes v New York State Elec. & Gas Corp.*, 82 NY2d 876, 877 [1993]). "Claims under the statute and common-law fall into two general categories: 'those arising from an alleged defect or dangerous condition existing on the premises and those arising from the manner in which the work was performed'" (*Winkler v Halmar Intl., LLC*, 206 AD3d 458, 459 [1st Dept 2022], quoting *Cappabianca v Skanska USA Bldg. Inc.*, 99 AD3d 139, 144 [1st Dept 2012]).

To impose liability upon a defendant for violations of the Labor Law or common-law negligence, the violations or negligence must constitute a proximate cause of the injuries (*see Blake v Neighborhood Hous. Servs. of N.Y. City*, 1 NY3d 280, 290 [2003]; *Egan v A.J. Constr. Corp.*, 94 NY2d 839, 841 [1999]).

> "In toxic tort cases, an expert opinion on causation must set forth (1) a plaintiff's exposure to a toxin, (2) that the toxin is capable of causing the particular injuries plaintiff suffered (general causation) and (3) that the plaintiff was exposed to sufficient levels of the toxin to cause such injuries (specific causation)"

(*Sean R. v BMW of N. Am., LLC*, 26 NY3d 801, 808 [2016], citing *Parker v Mobil Oil Corp.*, 7 NY3d 434, 448 [2006]).

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

Page 19 of 31

[* 19]

19 of 31

To establish general causation, the plaintiff must show that "the toxin is capable of causing the particular illness" (*Parker*, 7 NY3d at 448; *see also Pauling v Orentreich Med. Group*, 14 AD3d 357, 358 [1st Dept 2005], *lv denied* 4 NY3d 710 [2005]). The plaintiff may establish general causation through epidemiologic evidence, which must be based upon a "generally accepted methodology for evaluating epidemiologic evidence when determining whether exposure to an agent causes a harmful effect or disease" (*Cornell v 369 W. 51st St. Realty, LLC*, 22 NY3d 762, 783 [2014], *rearg denied* 23 NY3d 996 [2014]).

As for specific causation, the plaintiff must make a showing of exposure of sufficient magnitude to cause the disease at issue (*see Parker,* 7 NY3d at 448). Although it is "not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship" (*id.*), the Court of Appeals has never "dispensed with a plaintiff's burden to establish sufficient exposure to a substance to cause the claimed adverse health effect" (*Cornell*, 22 NY3d at 784). The plaintiff may, by using generally accepted methods, establish specific causation using "mathematical modeling or comparing plaintiff's exposure level to those of study subjects whose exposure levels were precisely determined" (*Todman v Yoshida*, 63 AD3d 606, 607 [1st Dept 2009]). "'[T]here must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of the agent that are known to cause the kind of harm that the plaintiff claims to have suffered'" (*Cornell*, 22 NY3d at 784, quoting *Wright v Willamette Indus., Inc.*, 91 F3d 1105, 1107 [8th Cir 1996]).

Here, defendants have demonstrated prima facie that plaintiff's injuries were not caused by his work at their sites. With respect to plaintiff's lung cancer, Dr. Sandler and Dr. Redlich opine that the medically-accepted latency period is not satisfied, given that plaintiff started working at the sites in May 2004, first developed symptoms in early 2011, and was diagnosed

159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 20 of 31

[* 20]

20 of 31

with lung cancer in April 2011 (NYSCEF Doc No. 424, Redlich aff, ¶¶ 10, 30; NYSCEF Doc No. 528, Redlich aff, ¶¶ 16-17; NYSCEF Doc No. 534, Sandler aff, ¶¶ 21-22). In addition, Dr. Redlich attests that lung cancer is not a condition that becomes exacerbated (NYSCEF Doc No. 424, Redlich aff, ¶ 47). Plaintiff also testified that his depression and anxiety stem from his inability to return to work following his lung cancer diagnosis and surgery (NYSCEF Doc No. 512, plaintiff tr at 1453-1456).[1]

With respect to plaintiffs' allegations of injuries relating to lead exposure, these injuries are alleged to have been sustained in connection with plaintiff's lead abatement work (NYSCEF Doc No. 504, supplemental response to defendants' demands for a verified bill of particulars as to all named defendants dated May 12, 2020 ¶ 1; NYSCEF Doc No. 438). Plaintiff only performed lead abatement work at the Thurgood Marshall Courthouse and on the 7 Stations project (NYSCEF Doc No. 512, plaintiff tr at 690-691, 760, 807, 847, 1216, 1271). Furthermore, Dr. Sandler and Dr. Redlich opine that lead toxicity in adults occurs with a blood lead level of at least 40 ug/dL for a significant period of time, and that plaintiff's blood lead levels did not exceed this threshold at any time during his work at Thurgood Marshall and at 7 Stations (NYSCEF Doc No. 528, Redlich aff, ¶¶ 20-22; NYSCEF Doc No. 534, Sandler aff, ¶¶ 30-36). Additionally, Dr. Sandler and Dr. Redlich state, upon reviewing plaintiff's blood lead level tests, that plaintiff's blood lead levels did not require regular testing or his temporary removal from the sites under OSHA standards[2] with respect to the Thurgood Marshall and 7 Stations projects (NYSCEF Doc No. 424, Redlich aff, ¶¶ 45-46; NYSCEF Doc No. 528, Redlich aff, ¶¶ 21-23; NYSCEF Doc No. 534, Sandler aff, ¶¶ 33-36). Dr. Sandler further states that

---

[1] Plaintiffs do not seek to recover for *purely* emotional injuries as a result of plaintiff's exposure to toxic substances (*cf. Kandem-Ouaffo v Pepsico, Inc.*, 133 AD3d 825, 827 [2d Dept 2015]).

[2] *See* 29 CFR 1910.1025 (j) (2) (i) (B) (regular testing), (k) (1) (i) (A) (removal of employee).

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

Page 21 of 31

plaintiff's highest blood lead level for the period at issue (June 2001 through April 2011) was 32 ug/dL on a single occasion, February 18, 2010 (NYSCEF Doc No. 534, Sandler aff, ¶ 35). Dr. Sandler further states that there are no known causal links between lead, paint, paint solvents, paint thinners, benzene, chemical strippers, and lead abatement materials and coronary heart disease, hypertension, and reduced kidney function (*id.*, ¶ 37). Thus, Dr. Sandler and **Dr. Redlich** have persuasively demonstrated that plaintiff did not sustain lead poisoning, and his exposure to chemicals, substances, and materials on these projects did not cause his other injuries.

Although QBC and Tishman/Bovis argue that the court should not consider Dr. Troast's affidavit because plaintiffs failed to disclose him as an expert, the current version of CPLR 3212 (b), which was in effect at the time of the motions, states that "[w]here an expert affidavit is submitted in support of, or opposition to, a motion for summary judgment, the court shall not decline to consider the affidavit because an expert exchange pursuant to subparagraph (i) of paragraph (1) of subdivision (d) of section 3101 was not furnished prior to the submission of the affidavit."

It is well settled that an expert's opinion "'must be based on facts in the record or personally known to the witness'" (*Hambsch v New York City Tr. Auth.*, 63 NY2d 723, 725 [1984], quoting *Cassano v Hagstrom*, 5 NY2d 643, 646 [1959], *rearg denied* 6 NY2d 882 [1959]). "An expert may not reach a conclusion by assuming material facts not supported by the evidence, and may not guess or speculate in drawing a conclusion" (*Ali v Chaudhry*, 197 AD3d 1084, 1086 [2d Dept 2021], *lv denied* 38 NY3d 904 [2022] [internal quotation marks and citation omitted]; *see also Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Santoni v Bertelsmann Prop., Inc.*, 21 AD3d 712, 715 [1st Dept 2005]). "In the absence of record support, an expert's

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

**Page 22 of 31**

22 of 31

opinion is without probative force" (*Guzman v 4030 Bronx Blvd. Assoc. L.L.C.*, 54 AD3d 42, 49 [1st Dept 2008]).

Plaintiffs have failed to refute Dr. Sandler's and Dr. Redlich's opinions that the medically-accepted latency period for lung cancer is at least 10 years. While plaintiffs rely on a meta-analysis of lung cancer in painters, that study does not mention latency period, and only states that there is a *risk* of developing lung cancer for less than 10 years of exposure, and that that risk increases with more than 10 years of exposure (NYSCEF Doc No. 591). Dr. Friedman's report also does not mention the latency period for lung cancer (NYSCEF Doc No. 602). Plaintiff's own doctor, Dr. Gochfeld, states that the latency period for occupational cancer to develop is 20 to 30 years (NYSCEF Doc No. 419 at 10). Thus, as Justice Bluth observed, there is uncontroverted expert evidence that plaintiff's cancer began to develop years before he worked at the sites outlined in the complaint (*see Zic*, 2020 NY Slip Op 30420[U], *2).

Moreover, plaintiffs have failed to raise an issue of fact as to whether plaintiff's exposure to lead was of sufficient magnitude to cause his other medical conditions. The record indicates that plaintiff painted and performed scaffold rigging work at Citi Field, Battery Maritime, the New York Times Building, and 90 Church Street, and did not perform lead abatement work at these sites (NYSCEF Doc No. 512, plaintiff tr at 577, 807, 846-847, 850, 1014, 1053, 1216, 1269, 1271; NYSCEF Doc No. 413, Ivankov tr at 114; NYSCEF Doc No. 519, Hamburg tr at 27).

Even though Dr. Troast, a toxicologist, and not a medical doctor, states that plaintiff's exposure to lead caused his coronary heart disease, hypertension, and renal disease, he has failed to demonstrate his qualifications to opine on specific causation (*see Guzman*, 54 AD3d at 49). The court has the discretion to determine whether a witness is qualified to testify as an expert,

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK** **Page 23 of 31**
Motion No. 011 012 013 014 015 016

and this determination will not be disturbed absent a serious mistake, an error of law, or an improvident exercise of discretion (*Meiselman v Crown Hgts. Hosp.*, 285 NY 389, 398-399 [1941]). An expert is qualified to proffer an opinion if the individual possesses "the requisite skill, training, education, knowledge or experience" to render a reliable opinion (*see Matott v Ward*, 48 NY2d 455, 459 [1979]). Dr. Troast's curriculum vitae is not annexed to his affidavit, and his affidavit does not otherwise explain how he is qualified to render an opinion about a medical diagnosis (NYSCEF Doc No. 590, Troast aff, ¶¶ 1-14).

Even if Dr. Troast were so qualified, his opinion is impermissibly conclusory (*see Nemeth v Brenntag v N. Am.*, 38 NY3d 336, 344 [2022] [internal medicine doctor's testimony was conclusory where she testified that individual's exposure to talc powder was a substantial contributing factor in causing mesothelioma, yet also stated that some exposures to asbestos were trivial and did not increase the risk of developing mesothelioma]; *Parker*, 7 NY3d at 449 [physician's testimony that the plaintiff's exposure was "frequent" and "excessive" "cannot be characterized as a scientific expression of [the plaintiff's] exposure level"]). Dr. Troast only reviewed the operative report and pathology notes related to plaintiff's lung cancer from 2011 and states, in a conclusory fashion, that "[t]o the extent that Mr. Zic was diagnosed with these serious medical conditions [i.e., coronary heart disease, hypertension and renal disease] it is more likely that they, too, are related to the lead exposures previously described" (NYSCEF Doc No. 590, Troast aff, ¶¶ 16, 44). Although Dr. Troast appears to rely on the CDC's "reference value" for determining whether blood lead level is elevated,[3] "standards promulgated by regulatory agencies as protective measures are inadequate to demonstrate legal causation"

---

[3] The CDC's "reference value" of 5 ug/dL was first adopted in 2012, after plaintiff's work at the sites alleged in the complaint (*see Cordero v Transamerica Annuity Serv. Corp.*, 39 NY3d 399, 416 [2023] [Rivera, J., dissenting]). Plaintiffs provide no authority for the proposition that the court can retroactively apply the CDC's reference value to his work years before the CDC's adoption of the reference value.

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

**Page 24 of 31**

[* 24]

(*Parker*, 7 NY3d at 450). Additionally, Dr. Troast does not explain what other causes he ruled out and why he did so (*see Cornell*, 22 NY3d at 785). Dr. Troast does not account for higher blood lead levels that plaintiff had prior to working at the sites at issue, including as high as 56 ug/dL in November 1999 (NYSCEF Doc No. 507 at 26). On the other hand, Dr. Sandler and Dr. Redlich state that plaintiff had a long history of Type II diabetes, high cholesterol, a strong family history of heart disease, and an abscess located on plaintiff's chest, which contributed to his reduced kidney function (NYSCEF Doc No. 534, Sandler aff, ¶¶ 41-42; NYSCEF Doc No. 714, Redlich reply aff, ¶¶ 68-69). And, Dr. Friedman does not offer any opinion regarding the amount of toxins or lead that plaintiff was exposed to at any of the sites at issue.

In light of the above, as defendants have established that they did not cause plaintiff's injuries, they are entitled to dismissal of the complaint. The court need not reach defendants' alternative arguments with respect to plaintiffs' Labor Law §§ 241 (6) and 200 and common-law negligence claims.

**QBC's Contractual and Common-Law Indemnification Claims Against L&L**

QBC moves for summary judgment on its contractual indemnification and common-law indemnification claims against L&L in the alternative (NYSCEF Doc No. 431 at 2; NYSCEF Doc No. 435 at 22). Given that QBC is entitled to dismissal of the complaint, the court need not reach the branch of QBC's motion seeking indemnification against L&L.

**Tishman/Bovis's Contractual Indemnification Claims Against L&L**

Tishman and Bovis move for contractual indemnification against L&L, requesting their attorney's fees in the defense of the action.

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 25 of 31

25 of 31

[* 25]

In opposition, L&L argues that if the court dismisses the complaint against Tishman/Bovis, then their claims for indemnification are moot. L&L contends that summary judgment is premature, as Tishman and Bovis cannot be indemnified for their own negligence.

The Battery Maritime contract provides as follows:

"The Subcontractor [L&L] agrees to indemnify and save harmless the Indemnitees [which include Tishman] from and against all liability, damage, loss, claims, demands, actions and expenses, including but not limited to attorney's fees which arise or are claimed to arise out of or are connected with an accident or occurrence with happens, or is alleged to have happened in or about the place where such work is being performed, whether at the Site or other place, (1) while the Subcontractor is performing the work, either directly, or indirectly through a Subcontractor of the Subcontractor or materials or vendors agreement, or (2) while any of the Subcontractor's or said Subcontractors' property, work in progress, equipment or personnel are in or about such place or the vicinity thereof by reason of or as a result of the performance of the work, including without limiting the generality of the foregoing, all liability, damages, loss, claims, demands and actions on account of personal injury, death or property loss to any Indemnitee, any Indemnitee's employees, agents, Subcontractors or invitees, any other Subcontractor, its employees, agents, Subcontractors or invitees, or to any other person . . ."

(NYSCEF Doc No. 521 at 4-5).

The Citi Field contract provides:

"To the full extent permitted by law, Subcontractor [L&L] agrees to defend, indemnify and save harmless Contractor, Hunt Construction Group, Inc. ('Hunt'), Bovis Lend Lease LMB, Inc. ('BLL') . . . from and against any claim, cost, expense, or liability (including attorneys' fees, and including costs and attorneys' fees incurred in enforcing this indemnity), attributable to bodily injury, sickness, disease, or death, . . . caused by, arising out of, resulting from, or occurring in connection with the performance of the Work by Subcontractor, its subcontractors and suppliers, or their agents, servants, or employees, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such injury, sickness, disease, death, damage, or destruction is caused by the sole negligence of a party indemnified hereunder"

(NYSCEF Doc No. 522 at 8).

"Words in a contract are to be construed to achieve the apparent purpose of the parties. Although the words might seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties

**159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

Page 26 of 31

26 of 31

[* 26]

had in view. This is particularly true with indemnity contracts. When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed. The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances"

(*Hooper Assoc. v AGS Computers*, 74 NY2d 487, 491-492 [1989] [citations omitted]).

An indemnification agreement is void and unenforceable to the extent that such agreement contemplates full indemnification of a party for its own negligence (*Itri Brick & Concrete Corp. v Aetna Cas. & Sur. Co.*, 89 NY2d 786, 795 [1997], *rearg denied* 90 NY2d 1008 [1997]). However, an indemnification provision which provides for partial indemnification to the extent that the party to be indemnified was not negligent does not violate the General Obligations Law (*see Brooks v Judlau Contr., Inc.*, 11 NY3d 204, 210-211 [2008] [indemnification "to the fullest extent permitted by law" contemplated partial indemnification and was permissible under the statute]). Even if the indemnification provision does not contain the savings language "to the fullest extent permitted by law," it may nevertheless be enforced where the party to be indemnified is found to be free of any negligence (*Brown*, 76 NY2d at 179; *Collins v Switzer Constr. Group, Inc.*, 69 AD3d 407, 408 [1st Dept 2010]).

Contrary to L&L's contention, Tishman and Bovis's indemnification claims are not moot, even though they are entitled to dismissal of the complaint (*Di Perna v American Broadcasting Cos.*, 200 AD2d 267, 269-270 [1st Dept 1994]). Pursuant to the indemnification provisions, L&L is obligated to indemnify Tishman and Bovis for all claims, actions and expenses, including attorney's fees (NYSCEF Doc No. 521 at 4-5; NYSCEF Doc No. 522 at 8).

Considering the contract provisions as a whole, the Battery Maritime contract does not violate the General Obligations Law because it provides that "In the event that 100 per cent indemnity is prohibited by law under the Paragraph above, then the extent of indemnity under

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

Page 27 of 31

27 of 31

said paragraph shall be limited to the portion of the damages . . . not attributable to the percentage of negligence of the Indemnitee" (NYSCEF Doc No. 521 at 5). The Citi Field contract contains recognized savings language "to the full extent permitted by law" (*see Brooks*, 11 NY3d at 210-211). Further, the indemnification provisions are triggered because plaintiff's *claims* arise out of his employment with L&L and the absence of safe and proper equipment provided by L&L (*see Ezzard v One E. Riv. Place Realty Co., LLC*, 137 AD3d 648, 649 [1st Dept 2016]; *Fuger v Amsterdam House for Continuing Care Retirement Community, Inc.*, 117 AD3d 649, 650 [1st Dept 2014]; *Espinal v City of New York*, 107 AD3d 411, 412 [1st Dept 2013]). The indemnification provisions do not condition Tishman or Bovis's right to indemnification upon a finding of fault by L&L or a third-party (*see Di Perna*, 200 AD2d at 270).

Accordingly, Tishman and Bovis are entitled to contractual indemnification for costs incurred in the defense of this action from L&L. The court refers the amount of attorney's fees incurred to a Special Referee to hear and report with recommendations.

### Citnalta and Judlau's Contractual Indemnification and Failure to Procure Insurance Claims Against L&L

Citnalta and Judlau also move for summary judgment on their contractual indemnification and failure to procure insurance claims against L&L in the alternative (NYSCEF Doc No. 530 at 2; NYSCEF Doc No. 535 at 2). Since Citnalta and Judlau are entitled to dismissal of the complaint, the court need not address this branch of their motion.

### Loss of Consortium

The loss of consortium claim must also be dismissed, since it is derivative of the other claims (*Kim v New York Presbyt.*, 170 AD3D 624, 625 [1st Dept 2018]; *Hazel v Montefiore Med. Ctr.*, 243 AD2d 344, 345 [1st Dept 1997]).

**159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No. 011 012 013 014 015 016**

**Page 28 of 31**

[* 28]

**Cross-Claims Against Defendants**

Finally, defendants move for summary judgment dismissing all cross-claims against them. There is no opposition to the requested relief. Accordingly, the cross-claims are dismissed (*see Norris v Innovative Health Sys., Inc.*, 184 AD3d 471, 473 [1st Dept 2020]).

## CONCLUSION

Accordingly, it is

**ORDERED** that the motion (sequence number 011) of defendant Hunt Construction Group for summary judgment is granted and the complaint and all cross-claims and counterclaims are dismissed with costs and disbursements to defendant as taxed by the Clerk upon the submission of an appropriate bill of costs; and it is further

**ORDERED** that the motion (sequence number 012) of defendant/third third-party plaintiff Queens Ballpark Company, L.L.C. for summary judgment is granted and the complaint and all cross-claims and counterclaims are dismissed with costs and disbursements to defendant as taxed by the Clerk upon the submission of an appropriate bill of costs, and the motion is otherwise denied; and it is

**ORDERED** that the motion (sequence number 013) of defendants/second third-party plaintiffs Tishman Construction Corporation, AECOM Technology Corporation, and Lend Lease Corporation f/k/a Bovis Lend Lease LMB, Inc. for summary judgment is granted and the complaint and all cross-claims and counterclaims are dismissed with costs and disbursements to said defendants as taxed by the Clerk upon the submission of an appropriate bill of costs, and the branch of the motion seeking contractual indemnification from second third-party defendant L&L Painting Co., Inc. is granted; and it is

159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No.  011 012 013 014 015 016

Page 29 of 31

**ORDERED** that the motion (sequence number 014) of defendants/third-party plaintiffs Citnalta Construction Corp. and Judlau Contracting, Inc. for summary judgment is granted and the complaint is dismissed with costs and disbursements to said defendants as taxed by the Clerk upon the submission of an appropriate bill of costs, and the motion is otherwise denied; and it is

**ORDERED** that the motion (sequence number 015) of defendants The New York Times Company, Forest City Ratner Companies, Forest City Enterprises, and AMEC Construction Management, Inc. for summary judgment is granted and the complaint and all cross-claims are dismissed with costs and disbursements to said defendants as taxed by the Clerk upon the submission of an appropriate bill of costs; and it is further

**ORDERED** that the motion (sequence number 016) of defendant Boston Properties Limited Partnership for summary judgment is granted and the complaint and all cross-claims are dismissed with costs and disbursements to said defendant as taxed by the Clerk upon the submission of an appropriate bill of costs; and it is further

**ORDERED** that the Clerk is directed to enter judgment accordingly; and it is further

**ORDERED** that the issue of the amount of reasonable attorney's fees that defendants/second third-party plaintiff Tishman Construction Corporation and Lend Lease Corporation Limited f/k/a Bovis Lend Lease LMB, Inc. may recover from third-party defendant/second third-party defendant/third third-party defendant L&L Painting Co., Inc. in the defense of the action is severed and referred to a Special Referee to hear and report with recommendations; and it is further

**ORDERED** that counsel for defendants/second third-party plaintiff Tishman Construction Corporation and Lend Lease Corporation Limited f/k/a Bovis Lend Lease LMB, Inc. shall, within 30 days from the date of this order, serve a copy of this order with notice of

159201/2012 ZIC, VELIMIR vs. CITY OF NEW YORK
Motion No. 011 012 013 014 015 016

Page 30 of 31

30 of 31

[* 30]

entry, together with a completed Information Sheet,[4] upon the Special Referee Clerk in the General Clerk's Office (Room 119), who is directed to place this matter on the calendar of the Special Referee's Part for the earliest convenient date; and it is further

**ORDERED** that such service upon the Special Referee Clerk shall be made in accordance with the procedures set forth in the *Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases* (accessible at the "E-Filing" page on the court's website at the address www.nycourts.gov/supctmanh).

| 1/2/2024 | | | |
|----------|---|---|---|
| **DATE** | | FRANCIS A. KAHN, III, A.J.S.C. | |
| | | **HON. FRANCIS A. KAHN III** | |
| | | **J.S.C.** | |
| CHECK ONE: | X CASE DISPOSED | ☐ NON-FINAL DISPOSITION | |
| | X GRANTED  ☐ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

---

[4] Available on the court's website at www.nycourts.gov/supctmanh under the "References" link on the navigation bar.

**159201/2012  ZIC, VELIMIR vs. CITY OF NEW YORK**
**Motion No.  011 012 013 014 015 016**